## Luck Walker v. The State.

### No. 7445. Decided February 21, 1923.

### Rehearing Denied May 23, 1923.

#### 1.—Murder—Indictment—Means of Committing Homicide.

Where, upon trial of murder, defendant moved to quash the indictment because it failed to allege the means by which the homicide was committed, but the motion set up no facts controverting the averment that the means of death were unknown to the grand jury, and no evidence was offered or was admissible under the averments of the motion, there was no error in overruling same. Following Harris v. State, 37 Texas Crim. Rep., 447.

#### 2.—Special Venire—Practice in Trial Court.

Where the defendant was out on bond and his attorney was present, a complaint that defendant was not present at the time that the order was made directing the issuance of a special venire writ and the drawing of the special venire was properly overruled.

#### 3.—Same—Practice on Appeal.

Where there was nothing to show when the requested charges were presented to the court before he gave his instructions to the jury, the same cannot be considered on appeal. Following Berg v. State, 64 Texas Crim. Rep., 612 and other cases.

#### 4.—Charge of Court—Self-Defense.

Where, upon trial of murder, the court gave the proper charge on self-defense, there was no error in overruling the objections thereto.

#### 5.—Charge of Court—Deadly Weapon.

The general criticism of the charge of the court to the effect that it does not give the defendant the benefit of the law requiring proof of an intent to kill, where the weapon is not *per se* a deadly weapon, is not sustained by the record.

#### 6.—Charge of Court—Murder—Practice in Trial Court.

The general charge of the court is not open to the objections urged against it. The evidence did not warrant the trial court in ignoring the issue of murder, and the credibility of the witnesses, and the weight of their testimony was for the jury, and there is no reversible error.

#### 7.—Rehearing—Charge of Court—Murder—Rule Stated.

If one, not in self-defense, or not under circumstances reducing to manslaughter, intentionally assault another with a deadly weapon, it is murder;

whether self-defense or manslaughter are in the case are issues of fact for the jury under proper instructions, and so is the issue of intent to kill. Following Ford v. State, 64 Texas Crim. Rep., 14.

### 8.—Charge of Court—Deadly Weapon.

Where the court gave in charge to the jury Article 1147, P. C., and in applying the law to the facts required them to believe beyond a reasonable doubt that there was an intent to kill on the part of the defendant and that the weapon used by him was one which, by the mode and manner of its use, was likely to produce death, they shall convict, there was no error. Following Betts v. State, 60 Texas Crim. Rep., 631 and other cases.

### 9.—Motive—Rule Stated—Sufficiency of the Evidence.

To prove motive is not indispensable in murder cases. Under the former law where an unlawful killing was shown and the facts did not reduce it to manslaughter or showed express malice, malice was implied and it would be murder in the second degree. While the degrees have been abolished by law, the power and right of the jury to imply malice was not taken away, nor is the right of the jury to settle conflicting facts and theories in any wise abridged, and the evidence being sufficient to sustain the conviction, there is no reversible error.

Appeal from the District Court of Titus. Tried below before the Honorable R. T. Wilkinson.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*J. N. Williams* for appellant.—On question of the court's charge: L. Griffin, 40 Tex. Crim. Rep., 312. Honeywell v. State, 40 id. 199; Shaw v. State, 34 id., 435.

*W. A. Keeling,* Attorney General, *C. L. Stone,* Assistant Attorney General.—On question of indictment: King v. State, 123 S. W. Rep., 135; and cases cited in opinion.

On question of court's charge: Kluting v. State, 90 Tex. Crim. Rep., 44.

MORROW, PRESIDING JUDGE.—Conviction is for murder; punishment fixed at confinement in the penitentiary for a period of twenty-five years.

The deceased, Don Turner, and appellant were together on the night of January 4th at the home of the witness Thomas. There was evidence that they had been drinking intoxicating liquor. They left the home of Thomas together, apparently in a friendly mood towards each other, and were riding in a buggy drawn by a mule. Later in the night, the witness Hargrove, who kept a country store, was aroused by a crash and heard a voice outside of his store, and shortly thereafter he heard some one knock at his door and use vile language to insist that the door be opened. The witness did not stir, however,

and heard a voice say: ''God damn it, what did you run off and leave me for; I will cut your damned head off.'' On the following morning he found a buggy which was by every evidence identified as that in which the parties were riding. The buggy had struck a post near the store building and was in a damaged condition. It was called for during the morning by the son of the appellant. The post had wire twisted upon it, and we gather from the record that the wire was barbed wire.

Appellant's son testified on behalf of the State and said that appellant came home at about ten o'clock on the night in question; that he had been drinking; that he had bruises about his body. These were described in some detail. Appellant told the witness that he had had a fight with Don Turner near Hargrove's store.

The deceased lived at the home of his uncle, Ed Coleman. After the deceased had been missed for some days, Coleman mentioned the fact to the appellant, who at first said that he had seen nothing of him. The witness then told the appellant that he had heard that they were together on the evening that the deceased was missed, and appellant said:

''We came along by the Redfearn crossing and stopped, and I got out, and we had a big switch in the buggy and he just come down on the mule with that switch and the mule ran off down the road as fast as he could go and that was the last I saw of Don.''

There were two ponds near Hargrove's store. About two weeks after the deceased had been missed, there was blood discovered on the bank or dam which held the water in the pond, and about fifteen or eighteen feet distant therefrom the body of the deceased was fished out of the pond.

There was a wound on the head of the deceased. It started at the eye-brow on the left side and extended four or five inches back and ended over the left ear. It was a deep wound and oval shaped and came to a feather-edge at the end. It entered the skull in a place about an inch and three-fourths. It penetrated the skull to that extent, and opened an artery which, according to some of the medical testimony, would have necessarily proved fatal.

There was evidence, pro and con, on the cause of the death of the deceased. The medical opinions were somewhat conflicting upon this subject but were sufficient to support the theory that the deceased was killed and afterwards put into the water. There was some evidence introduced to the effect that there were tracks or at least impressions that might have been made in the mud between the blood that was found on the bank and the place where the body was found. These impressions were discovered after the water had been drained out of the pond.

There was evidence that the deceased's character was that of a

violent and dangerous man and especially when he was under the influence of liquor.

Appellant's reputation as a kind and inoffensive man was good. He testified in his own behalf, in substance, that after leaving the home of Thomas, he and the deceased were on their way to Hargrove's store; that the buggy was stopped.

Appellant got out of the buggy and while standing between the wheels to relieve his bladder, the deceased whipped the mule and caused it to run and the buggy ran over the appellant. Appellant, after recovering himself, followed on foot and found that the buggy had been run against a post and the mule had gone. The buggy was in a broken condition. He heard the deceased knock at the door of a store and curse, and as he left the door, appellant met him and asked him why he ran over him and tore up the buggy. Deceased said: "Damn you, I did not run over you." Appellant replied: "You know damned well you did," and deceased said: "By God, don't you like it?" and appellant said: "No, I don't like it, that is Hale's buggy, and you will have it fixed." Deceased then said: "Damn you and Hale both, I will kill the whole damned business." Appellant said: "I got my knife and started to walk off and I told him not to run on to me with that knife. He had a knife in his hand. When I started to walk off, he said, 'Run you son-of-a-bitch, you,' and ran on me and struck at me. I threw up my left hand first and when he struck at me I struck him. I do not know whether I hit him or not. I could not tell, for he either tripped me or I tripped myself and I fell. We both went to the ground, but I twisted loose from him some way. I ran home and he ran towards the pools."

Appellant also described the wounds that were on him as a result of the buggy running over him and knocking him down. He said: "I don't know to this day whether I cut Don Turner or not, and if I did, I don't know when it was unless it was when I struck at him" in response to the attack by Turner; that he did not know when Turner cut him on the arm unless it was at the same time. Appellant said that all that he did was for his own protection and with no intention of killing him. Appellant exhibited the knife that he was using at the time, which was described as having a blade two and one-half inches long and three-eighths of an inch wide. The blade came down to a point and was not very sharp.

There was opinion testimony to the effect that the knife in the hands of a man of appellant's size could be used so as to cause death.

In a motion to quash the indictment, appellant urged that it was insufficient in failing to charge the means by which the homicide was committed. The motion purports to set up no facts controverting the averment in the indictment that the means of death were unknown to the grand jury and no evidence was offered or was admissible under the averments of the motion. It simply raises the

94 T. C.—27

legal question whether an indictment in the form mentioned would be so indefinite as to meet the constitutional and statutory requirement demanding that the accused be informed of the nature of the charge against him. Mr. Wharton, in his work on Criminal Procedure, 10th Ed., Sec. 198, treats the subject thus:

"If a particular fact, or condition, which is one of the component parts of the offense, can not be accurately described, the indictment will be good, if it state that such fact or condition is unknown to the grand jury, provided that the fact or condition in question be described as accurately as possible. But this allegation, that the name or other particular fact is 'unknown to the grand jury,' is not merely formal; on the contrary, if it be shown that it was, in fact, known to them, then, the excuse failing, it has been repeatedly held that the indictment was bad, or that the defendant should be acquitted, or the judgment arrested or reversed."

See also Bishop's New Crim. Proc., Sec. 514; Wharton on Homicide, page 847. The correctness of the principle stated in the text was affirmed by this court in the case of Harris v. State, 37 Texas Crim. Rep. 447. It is there stated that in a case where it is doubtful how death was caused, it is allowable to charge that it was done by some means unknown to the grand jury. In the same case it is also said that it was not necessary that the State introduce proof to show that the means of death were unknown to the grand jury. The court said that the rule applicable to an indictment for theft requiring proof of an averment that the name of the owner was unknown to the grand jury was not to be applied to an averment touching the means of death in a case of homicide, especially where there is nothing to suggest that the means of death were known to the grand jury. See also Wharton's Crim. Law, Sec. 658; Wharton's Crim. Ev., Sec. 93.

We understand the case of Carr v. State, 80 Texas Crim. Rep., 465, 190 S. W. Rep. 728, is not in conflict with this view. It simply asserts the view that the grand jury should state the means of death if know. The same is true of Huddleston v. State, 70 Texas Crim. Rep., 260, 156 S. W. Rep. 1168.

Touching the name of the deceased, it seems that the same rule applies in homicide cases as in cases of theft, that is to say, that the averment of want of knowledge on the part of the grand jury must be sustained by proof. McCloy v. State, 47 Texas Crim. Rep. 125; Wharton on Homicide, Sec. 569.

We fail to find any bill of exceptions to the action of the court in refusing to sustain the motion to quash the special venire. The motion contains averments of facts which are apparently controverted by the memorandum of the trial judge. The complaint in the motion, however, is that the appellant was not present at the time that the order was made directing the issuance of a special venire writ, and

the drawing of a special venire of ninety men. The judge certified
that the appellant was out on bond and that his attorney was present.
We do not understand that appellant's presence was necessary.

The court submitted to the jury the issues of murder, manslaughter,
self-defense and aggravated assault. No complaint of the refusal of
special charges is presented in a manner which can be reviewed. We
find some special charges copied in the record and mentioned in the
brief, but there is nothing to show when they were presented to the
court before he gave his instructions to the jury. The law requires
that they be presented before the argument begins. See Code of
Crim. Proc., Art. 737a; Berg. v. State, 64 Texas Crim. Rep. 612;
Bain v. State, 73 Texas Crim. Rep. 528; Gill v. State, 84 Texas Crim.
Rep. 531; Whitley v. State, 90 Texas Crim. Rep. 503.

The exceptions to the court's charge are all general. One more
specific than others is that contained in the fourth subdivision, from
which we take the following quotation:

"This is misleading to the jury and in a way informs the jury that
unless the deceased was armed with such an instrument and making
such acts that the right of self-defense would not be available to de-
fendant."

After stating abstractly the law of self-defense, the court charged
thus:

"If from the evidence you believe that defendant killed the said
Don Turner but further believe that at the time of so doing the de-
ceased had made an attack on him, which, from the manner and
character of it and the relative strength of the parties and the defend-
ant's knowledge, of the character and disposition of the deceased,
caused him to have a reasonable expectation or fear of death or serious
bodily injury and that acting under such reasonable expectation or
fear, the defendant killed the deceased, then you should acquit him."

Apparently this charge is not subject to the criticism addressed to
it in the exception quoted. From appellant's testimony, it appears
that the deceased attacked him and cut him with a knife. The para-
graph of the charge in question seems applicable to this phase of the
testimony.

The general criticsm of the charge of the court to the effect that
it does not give the appellant the benefit of the law requiring proof
of an intent to kill, where the weapon is not per se a deadly weapon
we think is not sustained by the record. The court used this language:
"* * * and if you further believe from the evidence, or have a
reasonable doubt as to such fact that the instrument used was not a
deadly weapon; that is a weapon which, from the mode and manner
used, was not calculated or likely to produce death or serious bodily
injury or if you believe from the evidence, or have a reasonable doubt
as to such fact that the defendant, at the time he cut the deceased,
if he did cut him, had no intention of killing him; then you are in-

structed that you could not convict the defendant of any grade of homicide but could only convict him of an aggravated assault, as the same is hereinafter explained to you."

We do not regard the general charge of the court as open to the objections urged against it. The evidence did not warrant the trial court in ignoring the issue of murder. The credibility of the witnesses and the weight of their testimony was for the jury. Art. 786 of the Code of Crim. Proc. The words uttered by the appellant on the trial was not the sole criterion. His testimony was to be weighed in the light of all the facts at hand. It is true that he testified that he struck the deceased with a knife, which knife he exhibited on the trial. There was also evidence, however, that this was a deadly weapon. Appellant testified that the deceased, when last seen by him, was running towards the pond. There was much evidence that the deceased was not drowned, carrying the inference that he was killed and that his body was hidden in the pond. The wounds upon him, according to some of the testimony, would instantly have disabled him so that he could not run. The evidence also suggests an axe as the weapon used.

Appellant's silence and declaration that he knew not the whereabouts of the deceased may have been regarded by the jury as incompatible with his testimony describing the fight. We think this court would not be justified in holding that the evidence of manslaughter or self-defense was of a nature to exclude the issue of murder.

There being no errors of the trial court brought up for review which make against the fairness of the trial, and the evidence as a whole being sufficient to support the verdict of murder, the decision of the jury, sanctioned by the trial judge, is binding upon this court.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

May 23, 1923.

LATTIMORE, Judge.—Appellant insists that the evidence as to the character of weapon used by him in the fatal difficulty is such that the learned trial judge erred in submitting the law of murder. The matter was discussed in our original opinion but deference to the insistence of appellant has led to another review. If one, not in self-defense or not under circumstances reducing to manslaughter, intentionally assault another with a deadly weapon and death ensue, it is murder; whether such assault be in self-defense or be reducible to manslaughter, or be murder,—are fact issues for the jury under appropriate instructions. If one not in self-defense and not under circumstances reducing to manslaughter, assault another and death

ensue and it be contended that the weapon used was not deadly and that the intent to kill was lacking,—these still are fact issues for the jury under appropriate instructions. Harding v. State, 51 Texas Crim. Rep. 559; Price v. State, 60 Texas Crim. Rep. 91; Ford v. State, 64 Texas Crim. Rep. 14.

The court below gave in charge to the jury Article 1147 P. C., and in applying the law to the facts required them to believe beyond a reasonable doubt that there was an intent to kill on the part of appellant, and that the weapon used by him was one which by the mode and manner of its use was likely to produce death, before they could convict. This was as far as the court was required to go. Johnson v. State, 42 Texas Crim. Rep. 379; Posey v. State, 46 Texas Crim. Rep. 190; Lucas v. State, 49 Texas Crim. Rep. 137; Betts v. State, 60 Texas Crim. Rep. 631. This would be the law even when death ensued from the cut of a knife which was not per se a deadly weapon. If one intending to kill uses a weapon not per se deadly but in a manner likely to produce death, he is guilty of murder if death results.

There seems little room for controversy as to what caused the death of deceased. All the witnesses who actually examined the only wound upon him said it was on the right side of the head, was four or five inches long, and penetrated the skull for more than an inch of its length. That this wound was inflicted by appellant is almost beyond dispute. He admitted a fight with deceased near Hargrove's store on the night of the disappearance of deceased, and claimed to have struck at deceased with a pocket knife. The body of deceased was found two weeks later in a pool of water some three hundred yards from said store; clotted blood covering a space about the size of a hat was found on the bank of said pool about sixteen feet from the body. When the pool was drained, long tracks led from a point where the blood was found to where the body was found, and thence away. Nothing was observed to indicate that deceased was alive when his body was placed in the water but the evidence seems convincing to the contrary. In the interim between the disappearance of deceased and the finding of his body appellant disclaimed any knowledge of the whereabouts of deceased. The story told by him on the witness stand was that he got out of the buggy in which he and deceased were riding in apparently friendliness, and was standing near or between the wheels and that deceased began to whip the mule causing it to run and thus knocked him to the ground; that the mule ran to Hargrove's store and there struck the buggy against a post, wrecking it; that when he walked up to said buggy deceased came from around the corner of the store, and when asked why he ran over appellant and tore up the buggy deceased began to curse and threatened to kill appellant; that he got out his knife and started to walk away, and told deceased not to run on him with the knife which he said deceased had; that deceased cursed him again and ran at him and that he struck back at deceased; both fell to the ground and got up, and

one ran one way and the other another; that he had seen deceased no more after this parting until his body was found in the pool. He swore that if he cut deceased he did not know it, and that he did not put the body in said pool of water.

The law of manslaughter was fully submitted as well as that of aggravated assault, and in this connection the learned trial judge told the jury that if appellant in a sudden passion arising from adequate cause unlawfully attacked deceased, and they believed or had a reasonable doubt thereof that the instrument or means used by appellant in said attack was not a deadly weapon; or if in such case they had a reasonable doubt of the fact that appellant intended to kill deceased, they could not convict him of more than aggravated assault. Again, applying the law to the facts in reference to aggravated assault, the court told the jury that if they believed that appellant attacked the deceased with a weapon which was not deadly or without intent to kill, that they should find him guilty only of aggravated assault. This seems to us to have been eminently fair to appellant and to have presented fully the only defensive theory appearing to have foundation in the facts.

Appellant strenuously insists that under the facts he is not guilty of more than manslaughter. We regret our inability to conclude that the verdict of the jury finding him guilty of murder is without support. The whole course of conduct of appellant at the time and thereafter as well as his testimony upon the stand, were for the jury.

If appellant had frankly told that deceased drove over him with the buggy and that this caused him to become so enraged as that he seized an axe or pocket-knife and struck him, thereby causing death, the jury might have concluded that he was telling the truth and adjudged him guilty only of manslaughter. But when the body of deceased is concealed and when found bears upon it a wound testified to by at least one physician as appearing to have been made by an axe, and when it further appears that after death the body of deceased was concealed apparently by his slayer, and when there is testimony that one killed by such a wound could not have gone the distance from the store to the pool of water, and when thereafter appellant denies any knowledge of the whereabouts of deceased, and when on trial tells the apparently flimsy story that he and deceased struck at each other with knives and separated, and one ran one way and one the other, and that he had not seen deceased since, we can understand how the jury seriously doubted the truth of any of his statements as to how the fatal difficulty arose or its attendant circumstances.

To prove motive is not indispensable in murder cases. Under the former law when an unlawful killing was shown, and the facts did not reduce it to manslaughter or showed express malice, malice was implied and it would be murder in the second degree. While the degrees

have been abolished by the statute, the power and right of the jury to imply malice was not taken away, nor is the right of the jury to settle conflicting facts and theories in anywise abridged. The jury are the exclusive judges of the ·credibility of witnesses and the weight of·their testimony and can in nowise be held to accept as true the statements and explanations made by one accused of crime. They may reject entirely his testimony and be wholly within their province. Ordinarily men who kill their friends in .moments of passion do not conceal their bodies or manufacture and tell false stories about the occurrences. When the law of a given case is fairly submitted upon the trial and all the theories are considered in the light of a proper instruction, this court does not feel inclined to disturb the verdict.

Finding no error in the motion for rehearing, same will be overruled.

*Overruled.*