### ED EBERS v. THE STATE.

No. 17678. Delivered June 19, 1935.
Rehearing Denied October 30, 1935.

The opinion states the case.

*Ned McDaniel* and *James E. Rexford,* both of Wichita Falls, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for 99 years.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed P. G. "Percy" Graves by striking him with a blackjack.

Deceased was a welder in the employ of The Texas Company at Electra. On occasions he drank intoxicating liquor to excess. About 4 a. m., on the 24th day of November, 1934, a deputy sheriff found deceased asleep in his (deceased's) automobile on a street in Wichita Falls. The officer aroused him and saw that he was intoxicated. Carrying him to jail, he placed him in a section known as tank No. 1, which consisted of one large enclosure, within which were several cells where the prisoners were segregated at night. There were other bunks within the tank outside of the smaller cells. At that time appellant was confined in the tank mentioned with a number of other prisoners. About twenty minutes after deceased had been placed in the tank prisoners called the jailer and advised him that deceased was dead. An autopsy disclosed that he had died from cerebral hemorrhage brought about by ex-

ternal violence. There was a wound over the left eye, at which place two bones were abnormally separated. There was another wound on the back of the head. We quote from the testimony of one of the examining physicians, as follows: "After we completed the autopsy we believed Mr. Graves (deceased) died as a result of some external injury causing a broken blood vessel, most probably in the base of his brain, and causing the blood to cover his brain to such extent as to get around the vital centers in the base of his brain, which have to do with the heart beat, and that the pressing and cutting-off of the blood supply which furnishes food and nourishment to the blood centers caused the man's death."

The inmates of the tank in which appellant and deceased were incarcerated were called to testify. The version of those introduced by the State was, in substance, as follows: When deceased entered the tank he sat down on a bunk known as the "cook table" which the prisoners used to keep a small cooking element and utensils on. At this juncture, appellant said to deceased: "Get up off of that G-d-d table." Deceased replied that he was not bothering anything. Appellant then approached him and struck him on the head with a blackjack, and, pushing him around, hit him on the back of the head with the same weapon. Some of the witnesses did not see the blackjack. Others thought appellant used his fist. Deceased fell to the concrete floor. Appellant dragged him to his (appellant's) bunk and took his clothes off. He and one Shaw then carried deceased to a shower bath, and, dropping him on the concrete floor, turned the water on him. Deceased was groaning. Appellant said: "I ought to kill the s-of-a-b-." Some of the witnesses told appellant deceased was dead. Appellant answered, in effect, that he would bring him to. He turned the water on deceased and let it run two or three minutes. He finally dragged the body back into the tank and left it on the concerete floor. The prisoners called the officers.

One of the witnesses testified that appellant asked him to say that he (appellant) was asleep when the matter occurred and had nothing to do with it. Witnesses testified to having seen a blackjack in appellant's possession shortly prior to the homicide. One witness said: "Yes, I saw the defendant with the blackjack; he had one. I venture to say it was about this long, about 12 or 14 inches long, and has a handle about 10 or 11 inches long on it and a round knob on the end of it. I don't know exactly what it was made of, but I do know what some of them were made out of. It would weigh almost a

pound I believe. I know what was in there. In the knob of the blackjack was a piece of iron. It looked like the bolt or tap that is screwed on the end of those bunks. There is a piece that runs out there about that way that had been broken off and torn up. It was a hand-made blackjack."

Appellant was approximately six feet and three inches tall and weighed about two hundred twenty pounds. Deceased was five feet and ten inches tall and weighed one hundred fifty pounds. Deceased was in a helpless condition. It was uncontroverted that he made no attack on appellant. We quote from the testimony of a physician as follows: "The blow which produced that fracture I saw on his left eye could have caused the hemorrhage of the brain which I found. It depends on how hard the blow was on the back of his head where I found that bruised place as to whether that blow could have been sufficient to have caused a hemorrhage of the brain. I found at the base of the brain some fluid. Most of it was clotted blood. If I saw Percy Graves (deceased) a man weighing about 150 pounds, 5 feet 8 or 9 inches tall, sitting on a cot or bunk in the jail, and a man the size of the defendant, 6 feet 3 or 4 inches tall, weighing about 220 pounds, about 32 years of age, took a blackjack made of metal, strips of metal, weighing about a pound, with a handle 4, 5, 6 or 10 inches long, and were to strike a blow over the head of this man Graves with it once, up the side of the head by the eye and he staggered away and he would catch him and knock him in the back of the head with it, and knock him limp, I think that would be sufficient to cause the hemorrhage that resulted in his death."

Appellant did not testify.

Appellant earnestly insists that the evidence is not sufficient to show an intent to kill. In Walker v. State, 94 Texas Crim. Rep., 414, 251 S. W., 235, which was decided prior to the repeal of the statute defining manslaughter, Judge Lattimore, speaking for the court, used language as follows: "If one, not in self-defense, and not under circumstances reducing to manslaughter, assault another, and death ensue, and it be contended that the weapon used was not deadly, and that the intent to kill was lacking, these still are fact issues for the jury under appropriate instructions."

In McNeill v. State, 80 S. W. (2d) 995, the proof showed that the deceased, who was the wife of McNeill, weighed about 130 pounds. It was uncontroverted that McNeill attacked her with a hickory stick 4½ feet long and an inch in diameter,

weighing 3 or 4 pounds. The deceased begged him to stop beating her, saying that he was killing her. Finally she ran from the house followed by McNeill. He did not hit her any more after they left the house. The proof on the part of the State was to the effect that the beating ruptured one of the lungs, causing pneumonia, which resulted in death. On prior occasions McNeill had assaulted the deceased and on one occasion had threatened to shoot her. The court instructed the jury to acquit of murder if they entertained a reasonable doubt as to whether McNeill intended to kill the deceased. More-over, an adequate and proper charge on the law of aggravated assault was submitted. We upheld the verdict of the jury finding the appellant guilty of murder with malice and assessing his punishment at confinement in the penitentiary for forty years.

In the present case the court instructed the jury upon murder with malice and without malice. He required the jury to find an intent to kill before a conviction for murder could be had. He gave a charge covering the law of negligent homicide and submitted an instruction covering the law of aggravated assault. Under the circumstances, we think the quotation from Walker's Case hereinabove set forth is applicable. In short, the question as to whether there was an intent to kill was for the jury.

Bills of exception 4 to 10, both inclusive, relate to proof on the part of the State that appellant was in possession of a blackjack shortly before the homicide. It was charged in the count of the indictment under which appellant was convicted that appellant killed deceased by striking him with a black-jack. Appellant sought to show by some of the inmates of the jail that he only used his fist in striking deceased. Two witnesses for the State testified that the assault was made with a blackjack. Under the circumstances, testimony that appellant was in possession of a blackjack from one to four days prior to the homicide was relevant and material. Relevancy is defined in sec. 97, Branch's Annotated Penal Code, as follows: "Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable. McGuire v. State, 10 Texas App., 127. Lane v. State, 164 S. W., 380."

Objection was made to the testimony of W. E. Claybrook

because it affirmatively appeared that he had been adjudged insane on the 23rd of October, 1934, and that said judgment had not been vacated. The witness testified that he was 39 years of age; that he had been adjudged insane in the district court of Wilbarger County in October, 1934; that he understood the nature of an oath and that a penalty would be inflicted if he testified falsely; that he had had spinal trouble and had been addicted to the use of narcotics; that since his confinement in jail he had been denied such use and his mind had become clear; that he believed he was capable of recalling past' events; that as far as he knew, his mind was clear at the time he was called to testify. An alienist testified that he had examined the witness on the 20th of December, 1934, and again on the 5th of January, 1935; that he took the history of his mental condition; that on neither occasion did the witness appear to be suffering from any delusions or false beliefs; that in his opinion the witness was sane on the two occasions he had examined him. It appears that the homicide occurred November 24, 1934, approximately a month after the witness had been adjudged to be of unsound mind. The testimony of the witness, as it appears in the record, is devoid of anything reflecting an unbalanced mind.

Appellant refers to Art. 708, C. C. P., which declares incompetent a witness who is in an insane condition at the time he is offered, or who was in that condition when the offense concerning which he is called to testify occurred. That there exists an unvacated judgment, adjudging the offered witness a lunatic, will not suffice to reject his testimony. Girvin v. State, 15 S. W. (2d) 643. In Downing v. State, 20 S. W. (2d) 202, this court used language as follows: "The admissibility of the testimony of one who has been adjudged a lunatic is in a sense a judicial question to be determined by the judge presiding at the trial upon evidence or facts before him. In this conection, it is to be noted the credibility of such testimony is a question for the jury, and for their information it would be competent that all the facts bearing on the subject be heard upon the trial."

In the present case, following the procedure laid down in Batterton v. State, 107 S. W., 826, the court instructed the jury at appellant's request to disregard the testimony of the witness if they believed he was insane. In this connection, we disclaim any intention of holding that such an instruction is required in any case. Under the circumstances reflected by the record, we are of opinion that the trial judge was war-

ranted in concluding that the witness was competent. See Nations v. State, 237 S. W., 570.

Bill of exception No. 11 relates to appellant's objection to testimony on the part of the State that appellant was seen in possession of a blackjack on the morning of the homicide and that he appeared to be destroying it. We think this testimony was admissible for the reasons stated in our discussion of bills of exception 4 to 10, inclusive.

Bills of exception 1 and 2 relate to argument on the part of counsel for the State. It is shown in bill No. 1 that counsel made the following statement in argument: "The defendant is a man who would kill just to see 'em kick." In bill No. 2 it is shown that counsel in argument said: "The defendant is like the two Jewish boys who killed little Bobbie Franks." In each instance the court sustained appellant's objection and instructed the jury to disregard the remarks of counsel. In view of the action of the court in withdrawing said remarks, the opinion is expressed that the bills fail to reflect reversible error.

A careful examination of all of appellant's contentions leads us to the conclusion that reversible error is not presented.

It is recited in the sentence that appellant is condemned to confinement in the penitentiary for a term of ninety-nine years. Giving effect to the Indeterminate Sentence Law, the sentence is reformed in order that it may be shown that appellant is condemned to confinement in the penitentiary for not less than two nor more than ninety-nine years.

As reformed, the judgment is affirmed.

*Reformed and affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING

HAWKINS, JUDGE.—Appellant predicates a motion for rehearing upon two propositions; the first being that we were wrong in holding that bill of exception number three complaining of the admission of the testimony of W. E. Claybrook presented no error, and the second being that we were in error in failing to find that the evidence did not show an intent to kill.

Upon the first proposition it is difficult to express our views any clearer than they appear in our original opinion.

The entire record has again been reviewed, and the original brief of appellant and the authorities cited by him have again been examined. The alleged error of the trial court in admitting the testimony of Claybrook was again argued in the motion for new trial, and at that time the trial court had before him the evidence of all the witnesses who had testified in the case, and had opportunity to judge by comparison whether Claybrook recalled and related clearly and intelligently the events of the killing. With the exception that Claybrook claimed to have actually seen appellant strike deceased with the blackjack we discern little, if any, material variance between his testimony and that of other witnesses as to occurrences preceding and following the actual assault. The trial court saw the witness and heard him testify, and in that regard is in much better position than we to judge whether he could and did recall and relate the facts of the killing clearly and intelligently. Realizing the importance of the matter, we have again given the question our serious consideration, but have been unable to reach the conclusion that the trial court committed error in permitting Claybrook to testify.

As to the second proposition upon which appellant urges a rehearing; we observe that the learned trial judge instructed the jury, in substance, that unless they believed from the evidence beyond a reasonable doubt that appellant intended to kill deceased they could not under the law find him guilty of murder. It must be presumed that the jury followed the court's instructions unless it can be said that no evidence is found in the record upon which the jury could base a finding of intent to kill. In determining such intent all the facts in evidence may be looked to. It is established beyond question by all the witnesses that appellant made an uncalled for and unprovoked attack upon deceased. The jury was amply warranted in finding that the assault was committed with a blackjack. The character of the wounds inflicted followed by the immediately death of deceased, may be looked to in determining whether the instrument used was deadly in its nature. Sec. 1587 Branch's Ann. Texas P. C. The witness Armstrong saw nothing in appellant's hand at the time he was striking deceased, but testified that he saw a blackjack in appellant's possession—"* * * two or three hours after he (deceased) died. He (appellant) was tearing them up at that time. He always had it in his possession is the way I would answer your question as to whether I seen him with that blackjack in his possession the day before this happened."

The description of the particular backjack referred to by the witness Armstrong is found in the original opinion, and is not repeated here. Another witness, Ray, testified that it appeared like appellant hit deceased with his fist. He saw no weapon in appellant's hand. This same witness testified that after deceased had been struck he was placed on a mattress. He follows with this testimony: "I don't know whose mattress that was to start with, after they took the man out it was folded up and put on that back bunk you see right in front of the shower. Then Ed told me to get my mattress and bring it out, and he told me to get that little new mattress on the back bunk and I got it and carried it to my bunk and I seen it was the one that man had laid on; it had blood that had run out of that man's nose, and I knew why it was given to me. That was the mattress I had to sleep on after that." He also testified that he saw appellant with a blackjack "that morning right after this happened," and that he had seen him with a blackjack the day before it happened. Other witnesses also testified that appellant had a blackjack the day before the assault was committed. Witness Barber saw the assault but disclaimed seeing anything in appellant's hand at the time, but saw appellant tear up a blackjack immediately after deceased's body was removed from the cell where the assault was committed. This witness further testified that appellant said to him regarding witness going before the grand jury—"You tell them that I was asleep, and did not know anything about it," and that shortly after the assault appellant said to witness, "Barber, you were asleep this morning when this happened," and when witness denied having been asleep appellant said, "Yes, you was." Said witness further testified that after deceased's body was removed he saw appellant tearing up some blackjacks, the pieces of which he threw in the garbage can and sent the can out. We have not undertaken to set out the evidence in full, and refer to our original opinion for the statement of additional evidence in connection with what has been here mentioned. Two witnesses testified positively and in detail to having seen appellant strike deceased two blows with a blackjack. Even without said positive testimony the jury would have been warranted in concluding that such was the weapon used. Appellant's efforts to suppress the testimony of witnesses to the killing, the shifting of the bloody mattress, the destruction of the blackjacks, the character of the wounds evidencing the force of the blows and the deadly character of the instrument

used, in connection with all other facts and circumstances in evidence, supports the jury's finding that appellant struck deceased with a blackjack, and that the same was a deadly weapon, and also warranted the jury in reaching the conclusion that appellant intended to kill deceased.

So believing, it is our duty to overrule appellant's motion for rehearing, which is accordingly so ordered.

*Overruled.*