## Will Puryear v. The State.

### No. 3479.    Decided November 28, 1906.

**1.—Murder in First Degree—Dismissal—Codefendant—Severance.**

Where upon trial for murder, defendant presented a motion to have his codefendant placed upon trial first so as to use his testimony, whereupon the State dismissed the case against said codefendant and did not place him on the witness stand though requested by defendant to do so, so that he might have had the benefit of cross-examination, and did not give immunity against further prosecution against said codefendant, the same was reversible error,. Overruling: Brown v. State, 42 Texas Crim. Rep., 176. Following: Wolf v. State, 46 Texas Crim. Rep., 231; Follis v. State, id., 203.

**2.—Same—Character of Deceased—Argument of Counsel.**

Where upon trial for murder the State's counsel on cross-examination of defendant asked him whether he did not know that the deceased was a peaceful man who did not resent even insults, and other questions of a similar import, which were answered in the negative over defendant's objection that this was proving the peaceful character of deceased in the absence of an attack by defendant on such character; and the State's counsel also commented on said testimony in his argument over defendant's objection. Held, reversible error.

**3.—Conduct of Jury—Clothes of Deceased—Jury Room.**

Upon a trial for murder, where the record showed that the clothes of deceased were introduced in evidence for the purpose of locating the position of the right arm of deceased at the time he was shot, and such examination of said clothes had been interrupted and not completed during the trial, and the court permitted the jury in their retirement to take said clothes with them; and it appeared from the record that the jury had made use of said clothes in the jury room to illustrate the position in which deceased held his arm when he was shot, and that one of the jurors tried to put on these clothes and became sick; and it was not shown clearly that said clothes were used for any other purpose than for that for which the same were introduced in evidence. Held, while not reversible error that great caution should be used in permitting this practice, and that the better practice is that such clothing be only used before the jury in open court; and then only to establish or make clear some point in the case.

**4.—Same—Conduct of Jury—Qualifications of Jurors.**

See opinion for facts showing that certain jurors who tried defendant were fair and impartial, and there was no error that the trial court so held.

**5.—Same—Argument of Counsel.**

Where upon trial for murder, the argument of State's counsel was objected to as a reflection on the jury and that the same was calculated to terrify them and to drive them into a verdict of murder in the first degree, and the record tends to bear out this construction such argument was unauthorized.

**6.—Same—Charge of Court—Manslaughter—Self-Defense—Provoking the Difficulty.**

Upon a trial for murder where the evidence showed that defendant shot deceased upon an insult by deceased, and there was also evidence on self-defense and provoking the difficulty, there was no necessity of charging on manslaughter, and the question was whether the defendant was guilty of either murder in the first or second degree, and a charge on provoking the difficulty was correctly submitted.

Appeal from the District Court of Travis. Tried below before the Hon. V. L. Brooks.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Dickens & Cupp, Walton & Walton,* for appellant.— On question of fairness to jury: Williams v. State, 75 S. W. Rep., 509. On provoking difficulty: Melton v. State, 83 S. W. Rep., 822. On question of character of deceased: Gregory v. State, 94 S. W. Rep., 1041; Keith v. State, id., 1044.

*J. E. Yantis,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death, and prosecutes this appeal.

The homicide occurred in the city of Austin, about 2 o'clock on the night of March 3, 1906. Deceased, Minas Long, was a bartender at the Sutor Bar, situated on Congress Avenue, on the block immediately north of the I. & G. N. depot. The Sutor saloon being the second building from the southeast corner of said block. Deceased was attending bar on that night, assisted by the porter, Jim Taylor. About 2 o'clock appellant and his companion, Harvey Carroll (the former engaged in business at the Crystal saloon, some three blocks north on Congress Avenue from the Sutor bar), came from the Crystal saloon into the Sutor bar. They appeared to be on friendly terms with deceased, and after being there a short time, Carroll suggested, if deceased would pay a check for him for a small amount, to which he would sign his wife's name, which would make it good, that he would set up the drinks. Deceased declined this, and stated that he would set up the drinks himself, which he proceeded to do. It appears that a glass bottle was set out for appellant, and Carroll took beer. After

appellant had poured out his whisky, deceased shoved it across the bar, turning the glass over and spilling the whisky. He set the bottle out again for appellant to refill the glass. Something was said about this, and one witness says that appellant said, "If 1 can't hurrah you, Bill, who can I hurrah with?" According to the State's testimony, which came through the witness Taylor, they stood awhile and talked; and presently Carroll went in the phone booth, which was in the same room, in the northeast corner behind the cigar stand. Appellant and deceased remained standing; deceased on the inside and appellant on the outside of the bar, talking in an easy and low tone of voice. After remaining there a little while, appellant left his position and went into the booth where Carroll was, and after the two remained there awhile, they came out. After remaining outside of the bar a little while, the phone rang, and deceased went to it. After coming out he ordered witness Taylor, who was back at the wash basin, to go and carry some oysters to Georgia Frazier's, some block or two from there. Witness Taylor left, and remained away some time in delivering the oysters, and came back to the saloon and found appellant and Carroll at the saloon, and also deceased, Long. A short time after he returned, appellant drew a six-shooter, and told deceased, in a loud tone of voice, that he would shoot his God damn heart out, and called him a mother fucking son of a bitch. He held his pistol on him a little while, and then put it in his pocket, and stood there some time. Deceased told him he was surprised at his drawing a six-shooter on him, and he ought to be ashamed of himself. Then everything got quiet, and they talked a little while. Witness did not hear the conversation, but heard appellant say he would shoot him. Deceased told him he had a gun, and if he wanted to shoot him he could shoot. Appellant said, "May be you think I won't shoot you," and at that time he pulled his pistol and shot. Deceased did not move. Appellant then shot the second time, and deceased fell, down behind the counter where he was standing. This witness says that he was standing where he could see deceased, and he made no hostile demonstration prior to the shooting. Immediately after deceased was shot, witness left to go for an officer.

Appellant testified on his own behalf, and he and Taylor were the only eye-witnesses who testified to the transaction.

Appellant narrates the homicide and circumstances attending it, substantially, as follows: that he and Carroll went from the Crystal saloon down to the Sutor saloon to see Long, whom they called "Minny," and that they were on terms of friendship. That a short while after they got there, Carroll told deceased that he would like for him to cash a check for him, and he would buy a drink; and said he would sign his wife's name to it, and it would be all right. To which deceased replied, "No, I will buy a drink myself." Deceased stood behind the bar, and appellant and his companion Carroll, went in front of the bar. The drinks were set out by deceased. Appellant took whisky, and Carroll

a glass of beer. Appellant was starting to drink his whisky when he noticed Long rolling a cigarette, and he walked around on the other side of Carroll, to the east of him (the bar being on the north side of the saloon, and running east and west) and asked deceased to give him a cigarette, which he did; that is, he gave him tobacco and paper to make one. About this time deceased said, "If you don't want to drink that whisky I will throw it out. Appellant replied that he certainly wanted to drink it, not to think he was sore about it. At this, deceased walked up and took hold of the whisky and shoved it, and shoved it out on the bar and turned it over on the bar, at the time saying, "Drink it, if you want to," but in shoving the glass turned it over. He immediately set another bottle out. Appellant poured out another glass of whisky and drank it. At this juncture deceased made some mention about the Milam transaction, asking appellant why he did not bring Dennie Milam down. To which appellant replied that he did not know whether he could or not, and then deceased said, "It looks like you would quit talking about it then and bring him on up." Appellant said he did not know whether he could bring him up or not. After they got through talking about Dennie Milam, deceased said, "You sons of bitches make me tired anyway." Appellant told him he ought not to talk that way; that his mother was a lady, the same as his. About this time Carroll went into the telephone booth. Appellant stood in front of the bar, where deceased was a minute or so, nothing further being said between them. He then went into the telephone booth where Carroll was, and asked him if he had anything. Carroll replied, no, only a knife. Appellant told him he did not want a knife. Appellant asked him if he had a gun, and felt around him for it; that he did not find anything, and he walked outside of the booth, and directly Carroll came out. In the meantime he said nothing to deceased. That as soon as Carroll came out, he and Carroll went up the street together; that is, up Congress Avenue to the Crystal saloon. They went up on the west side, as far as Chile's drugstore, which was some three blocks north, and then diagonally northeast to the southwest corner of Sixth Street and Congress Avenue. On the way he told Carroll that he was going to the Crystal saloon to try to get a gun. That he was going to get a gun and go and call Minas Long what he had called him. That they went into the Crystal saloon; that he went in behind the bar, where Rutherford (the bartender) was sitting reading a paper; and said something to Rutherford, did not remember what it was. That he got a pistol from behind the bar, back of Rutherford; that he and Carroll immediately left the saloon, going out the front door. They went across to Chile's drugstore, and then turned south down Congress Avenue. On the way he told Carroll that he was going down there and cuss Long for a son of a bitch, as he had him. Carroll told him he was with him, right or wrong. When they got back to the saloon, Long was standing behind the bar; that he did not see Jim (porter) there at this time. As soon as he got into the saloon, he went up to the bar,

and said, "Minny, you called me a damn son of a bitch, a while ago. I am going to call you a damn son of a bitch now. I've got my gun and you get yours." At the same time appellant pulled his gun, laid his hand on the bar, with the pistol presented. "I told him 'I did not want to hurt you; did not want to hurt a hair on your head. I want to be your friend. I don't want you or anybody else to call me a son of a bitch any more.'" While appellant was holding the gun on deceased he did not do or say anything. In a little while, appellant put his pistol up. Presently Long (deceased) said that appellant could have shot him if he wanted to, or something like that. Appellant told him he did not want to shoot him, but Long remained standing in the same position behind the bar, back near the cash register. Presently, probably fifteen minutes after he put his gun up, he started to go out; he and Carroll. They had gotten two or three feet away from the bar, and appellant turned to deceased and said to him, "Probably you will have me arrested for what I have done to-night." Deceased said, "No, I won't, you damn son of a bitch," and reached under the bar, and as he did, appellant pulled his pistol and shot him. Deceased had been standing straight before he made the last remark, and when he was shot he was standing rather leaning. Appellant shot him after he made the motion. That on the first shot deceased straightened up, Appellant did not know whether he hit him or not, and he shot again and deceased immediately fell behind the bar. Appellant went around behind the bar, got up over deceased, and deceased said, "Don't shoot me any more, Bill." Appellant put his gun in his pocket and walked out. Appellant further stated that his intention in going back to the saloon, after he got the pistol, was to call deceased what he had called him, and he got the pistol to protect himself with; that after deceased did not do anything when he called him a son of a bitch, it was over with as far as he was concerned, and he put his pistol up. As he started to leave, he asked him if he was going to have him arrested because he wanted to be friendly with him; that he did not want to be arrested, if he could keep from it; that he did not shoot deceased for calling him a son of a bitch, but because he reached, as he thought he was going to get a gun to kill him (appellant) with; that he called him a son of a bitch at the same time he made the motion to get the gun. On cross-examination appellant said, he went back there to call deceased a son of a bitch, because he had called him one; that he did not know whether deceased would take it or not; that he did not care particularly whether he took it or not; that after calling him a son of a bitch, if deceased tried to kill him, he would defend himself; that he got the gun to protect himself with, if deceased tried to kill him; that he did not know whether deceased would take the son of a bitch; that a good many people would not take it; that he got the gun because he did not know whether deceased would take it or not; that he thought probably deceased would not take it and would kill him; that he thought maybe deceased would try to kill him; that

he knew the language used was liable to provoke a difficulty; and he thought it was necessary to have a pistol in order to protect himself; that he did not go back there to have a quarrel with deceased but went back there to call him a son of a bitch; that he told deceased to get his gun; that he had one and naturally supposed that he would get one; that he wanted him to get a gun so he would have a chance for his life; that he said that because he expected a fight. This is appellant's version of the homicide.

The State offered the declarations of deceased as to the cause of his death, either as res gestæ or dying declarations, perhaps both, to the effect that in reply to the question, "What is the matter?" or words to that effect, after the doctor got there, he says: "I am shot. I am afraid or I am uneasy about this wound in my side." He further stated, "It is mighty hard to be shot over a 15 cent drink." And further said, "I can not understand why he did it. Well, I just don't understand it. I don't know what he meant." That defendant had shot him.

This is a sufficient statement of the case, in order to discuss the assignments of error.

The first proposition insisted on by appellant is to the effect that the court erred in dismissing the case against appellant's codefendant, Harvey Carroll, and in not postponing the case until said Carroll could be tried. The matter arose in this way. When appellant was brought to trial, he presented a motion, alleging in substance that Harvey Carroll was indicted for the same homicide, and that he believed there was no evidence against him, and desired him to be first tried, so that he could use him as a witness on his own behalf. In response to this motion, the State filed a motion to dismiss the case against Harvey Carroll. The motion among other things states, "That the court in response to said motion had ordered Carroll to go to trial first, unless he desired to make a similar affidavit. That said Carroll had not offered to do so. That it was further alleged that the testimony against Puryear is direct and that against Carroll largely circumstantial; and that Carroll is an eye-witness of the killing by Puryear, and that the ends of public justice demanded the dismissal of the case of Carroll. That among other things, Puryear might have the benefit of Carroll's testimony, unclouded by pending prosecution; and the State craved a dismissal of the case against Carroll." The court, in response to this, adjudged as follows: "And the court having duly considered said motion and also having heard the evidence on the hearing of the writ of habeas corpus, and the court being of the opinion that the evidence against said defendant Carroll is not sufficient to warrant a conviction, it is therefore ordered by the court that this cause be and is hereby now dismissed, and the defendant, Harvey Carroll is discharged."

The State did not place Carroll on the stand as a witness, though requested by appellant, so that he might have the benefit of cross-exam-

ination. However, the State tendered said witness to appellant, but he refused to place him on the stand.

In Brown v. State, 42 Texas Crim. Rep., 176, 58 S. W. Rep., 131, it was held that in response to a motion to sever, similar to the one now before the court, the State could dismiss the case against the codefendant without guaranteeing him immunity against further prosecution; and appellant could use him as a witness, and that this would not constitute error. The writer of this opinion dissented from that view, on the ground that appellant had a right to the testimony of his codefendant untrammeled by a pending prosecution or one that might be brought against him, or one that might be renewed against him. In Manor v. State, 45 Texas Crim. Rep., 370, 8 Texas Ct. Rep., 86, "Defendant and two others being jointly indicted a severance was granted defendant in order that a codefendant might be first tried. The court, on motion of the district attorney, dismissed the indictment as to the codefendants, and the latter were re-arrested on complaints. The case against defendant being called after the dismissal, a continuance was refused, and in the trial defendant placed the codefendants on the stand and they refused to testify for fear of incriminating themselves. Held, error. The severance gave the defendant the right to have his codefendants first tried, and this right could not be defeated in the manner attempted." It will be seen from the above, that the defendants from whom appellant desired severances, after their cases were dismissed, refused to testify on the ground that their testimony might incriminate them. Consequently appellant did not have the benefit of their evidence. The object of his severance was defeated. This case illustrates and enforces the views of the writer on this subject. Wolf v. State, 46 Texas Crim. Rep., 231; Follis v. State, 46 Texas Crim. Rep., 202. In the latter case, Follis made a motion to sever from his codefendant Dock Brunson, who had been indicted as an accomplice with him, and asked that he be first tried, so that he might have the benefit of his testimony. The case against Brunson was dismissed, and he was kept in jail, being at the time sick. The court, after passing directly on the question, say, inasmuch as the case was reversed on other grounds, that if the severance is sought for Brunson on another trial, it should be granted and he first tried. The effect of these decisions is to overrule the case of Brown v. State, supra; and we accordingly hold that the severance should have been granted and Carroll placed on trial first, in accordance with the motion of appellant. Or if the State would deprive appellant of his right to sever from his codefendant, the case against Carroll should have been dismissed, with the guaranty on the part of the State of immunity from any future prosecution for said offense. In such case the witness could be required to testify and could testify freely and voluntarily, without being trammeled with a pending prosecution, or one that might be brought against him for said offense.

On the trial, and while appellant was on the stand testifying on his own behalf, on cross-examination by the State, the following questions were propounded, eliciting the answers set out, over the objections of appellant: "Q. The truth of the matter is, you have been wanting for a year or two to get up the reputation of a desperado. A. I have not. Q. And took the most inoffensive man in town to kill? A. I don't know about that. Q. Did you ever know of any difficulty he was in? A. I did not. Q. Had he ever used a profane word to you before that night? A. Not before that night; no sir. Q. Didn't you know that he was a peaceful man that didn't even resent insults? A. No, sir; I didn't know it. I have never seen any one insult him." This was objected to by appellant on the ground that it was proving the peaceful character of the deceased, which it was not competent for the State to do. Appellant not having offered any evidence as to the character of the deceased as being a violent and dangerous man, or as a peaceful and inoffensive man. The court overruled these objections, holding that it was legitimate in cross-examination of the witness. In this same connection it may be proper here to state that in the argument of the case, appellant reserved a bill of exceptions to the remarks of counsel, on this subject of the character of the deceased, to wit: the district attorney in said argument used substantially, the following language: "The deceased was a member of a pioneer family; a family that has been here from the first, and he was himself a worthy son of that family. Deceased was a harmless man. He was a man of a sunny disposition, a friend of every man and did not have an enemy. This much I am able to tell you from the defendant's own evidence. I can also tell you from defendant's own statements testified to by him on that stand, that Minos Long was a peaceable man who never took the Lord's name in vain, and who made no enemies." Defendant's counsel objected to these remarks on the ground that the district attorney had no right to tell the jury anything about the family of deceased or about the deceased relatives, or about the character of the deceased, because said counsel claimed there was no evidence before the jury relating to the character of the deceased or to his family or relatives. The court sustained said objection, in so far as the same related to that portion of the district attorney's remarks, that deceased was a member of a pioneer family, and instructed the jury to disregard the statement of the district attorney to that effect; but the court overruled so much of said objection as related to the character of the deceased and refused to caution the district attorney not to allude to the character of deceased. The reason for this latter action of the court was that in its opinion there was evidence in the record relating to the character of deceased, and warranting the district attorney in commenting thereon. While the testimony elicited was of a negative character, yet it has been said that this affords strong evidence of character in the respect testified about, and the court seems to have so regarded it. The question therefore, is, can the State in the first instance

put the character of deceased in issue as being an inoffensive and peaceable man. Without going into the reasons pro and con on this subject, we simply follow the authorities, which hold that this cannot be done. Gregory v. State, 94 S. W. Rep., 1041; Keith v. State, 94 S. W. Rep., 1044; Melton v. State, 83 S. W. Rep., 822; Moore v. State, 79 S. W. Rep., 565.

Appellant also excepted to the conduct of the jury in taking into the juryroom after their retirement to consider of their verdict, the bloody clothes of deceased. It appears that these clothes were introduced in evidence, evidently for the purpose of locating the position of the deceased, especially his right arm at the time he was shot. There was some effort made before the jury by the district attorney to use these shot holes in the clothing (which was in evidence) to illustrate the position of the arm of deceased. While he was endeavoring to do this, with the assistance of one of the jurors, he was interrupted and did not complete the illustration. The court told the jury that they could take the clothes introduced in evidence, if they desired, in their retirement. Without any further knowlededge, except as suggested by the court, after the jury retired, they sent for and used them in the juryroom to illustrate the position in which deceased's arm was at the time he was shot, as tending to show that at that particular time he was not reaching for a pistol. It further appears in this connection that some of the jurors tried on these bloody clothes in the juryroom, and one of them trying on the bloody clothes became sick: evidently from the effect of this experiment. We are not informed by the bill as to the extent the clothes were used in evidence further than as is suggested above. Some of the jurors say that they were only used to illustrate the same point they were used in evidence for. Ordinarily clothing and the like, which has been introduced in evidence may be taken by the jury on their retirement, but their use should be confined to the very purpose for which they were introduced in evidence, and not for some ulterior purpose. Spencer v. State, 34 Texas Crim. Rep., 238; Chalk v. State, 35 Crim. Rep., 129. The bill does not show clearly that the bloody clothing was used for any other purpose than that for which the same were introduced in evidence. However, the use of the same in the juryroom seems to have affected at least one of the jurors, and we therefore observe that great caution should be used in permitting the use of bloody clothing in the juryroom, especially when they may be appropriated by them to excite prejudice or passion. On another trial, we would suggest that this clothing, if introduced in evidence, be only used before the jury in open court; and then only as evidence to establish or make clear some point in the case.

Appellant also urges that this case should be reversed because two of the jurors who sat in the case, to wit: Kitchens and Ellis were not fair and impartial jurors; and he introduced in evidence affidavits and the testimony of two witnesses as to Kitchens, showing that a month

prior to his being taken on the jury, he made remarks, in the presence of witnesses, to the effect that appellant was guilty and ought to be hanged; and also introduced evidence of two witnesses, Harris and Colley, to the effect that Ellis had made in their presence, sometime prior to the trial, the same character of remarks attributed to Kitchens. The State controverted this, and the two jurors themselves contradicted and explicitly denied that they made such remarks, or that they had any such opinion. The State also reinforced these jurors with other testimony bearing on the point. We believe that the court was authorized to hold that the two jurors were fair and impartial jurors. Appellant also attacked the fairness and impartiality of the juror Ellis by the testimony of W. E. Puryear, the father of appellant, to the effect that said juror informed him, a short while before the trial, that he was friendly to his son in his trouble; and that he further. desired said Puryear to go with him to his room and make that his stopping place while attending the trial; and he also told said Puryear that the case against his son could be beat but it would take $200 to do it. Puryear informed him that he had no money to spend on the case. This matter was denied by the juror Ellis, and the State reinforced his testimony by other circumstances. We believe that the court was authorized to hold, as he did, that the alleged misconduct, as testified to by the witness Puryear, did not occur.

Appellant excepted to the argument of the district attorney, to the effect: "When I was a little boy and asked how birds were caught, I was told they might be caught by throwing salt on their tails. Some people think that jurors are caught and induced to bring in unrighteous verdicts by. the same method. I do not believe that any juror in this case has been tampered with, or can be tampered with; but some of the arguments advanced by counsel for the defendant sound to me as if he might think some of the jurors have salt on their tails. When counsel for the defendant attempt to argue to you that deceased was killed by defendant in self-defense, it sounds to me like an argument intended for a salted jury. Their argument that the State has been unfair to the defendant in refusing to put Harvey Carroll on the stand sounds to me like another such argument. If when the jury has retired and is considering of its verdict, jurors should be found advocating the acquittal of the defendant or advocating any other verdict than the death penalty, they will be also found maintaining their positions by arguments intended to catch salted jurors. As I said before I do not believe that there are any such jurors serving in this case, therefore I trust and believe that you will return a verdict of death." This argument was objected to by appellant as improper and constituted a reflection on the jury, and that the same was calculated and intended to terrify jurors and make them afraid to express their opinions and drove them to vote for murder in the first degree and nothing else. The court refers to the motion in the record as to a verification of this bill. We have examined the

same, and it occurs to us that there is no substantial difference. We do not believe that the argument of this character was authorized, and it should not have been indulged.

The court charged on murder in the first and second degrees, manslaughter and self-defense; and all of these charges are in some respect criticised by appellant. From a careful review of the facts, which we have substantially stated, in our opinion there is no manslaughter in this case, though the court out of abundant caution instructed the jury upon this issue. If appellant was guilty, he was guilty of either murder in the first or second degree, depending on the state of mind in which the intent to take the life of deceased was formed. If his intent was formed at the time he testified he was first insulted by deceased, or directly thereafter, and his mind was cool and deliberate at the time he formed such intent, and capable of contemplating the consequences of his acts, and he procured the pistol and returned to the saloon, and slew deceased on such intent previously formed, he was guilty of murder on express malice. If, on the other hand, appellant was insulted by deceased and his mind was excited by passion, was not cool and deliberate, and he then formed the intent to slay deceased and procured a weapon, and consummated his purpose before cooling time had elapsed, he was guilty of murder in the second degree. If when appellant left the saloon he had not formed the intent to take the life of deceased, but procured a pistol and returned to the saloon, and drew his pistol on deceased, and cursed and abused him, and deceased did not resent it, and he afterwards started to walk away, and deceased again cursed and abused him, and appellant's mind became excited, and he then formed the intent to kill deceased, and did so, then he was only guilty of murder in the second degree. And this is the only contingency, as it appears to us, wherein a charge on self-defense was required; that is, if appellant at this juncture had abandoned the difficulty and withdrawn therefrom, and deceased renewed it, and made a demonstration as if to get a weapon, and appellant believed himself thereby placed in peril of his life or serious bodily injury, he might have the right of self-defense. However, if there was no abandonment, and he came there, as he says himself, to provoke a difficulty, and if appellant resented it, that he expected to have a mortal combat with deadly weapons, he could not claim self-defense. The charge on self-defense, aside from the suggestion in the charge that the jury must believe that there was a pistol behind the bar, appears to us to be otherwise correct. Of course, it was not necessary that there should have been a pistol in the direction where appellant says the deceased reached. If he believed that appellant was reaching for any weapon, regardless of whether there was such weapon present or not, his right of self-defense would be the same on the appearances of danger. We believe that the court was fully authorized to give a charge on provoking the difficulty. According to appellant's own testimony, he left the saloon to procure a

weapon, and came back, and applied to deceased the same opprobrious epithet, which he says deceased had applied to him. This, we think, sufficiently authorized the court to charge on provoking the difficulty. See McCandless v. State, 42 Texas Crim. Rep., 58, for character of charge to be given on this subject.

We do not believe it necessary to discuss other matters assigned as error. For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*