# T. C. SAUCIER V. STATE.

No. 24647. February 22, 1950.
Rehearing Denied January 31, 1951.
Order of Supreme Court of United States, Denying Petition
for Writ of Certiorari, Filed June 4, 1951.
Motion for Rehearing to Supreme Court of United States
Denied October 8, 1951.

302

Hon. Frank Ikard, Judge Presiding.

*W. W. Ballard,* Wichita Falls (*Eugene Sherrod, Jr.,* Wichita Falls, *Joe Cleveland,* Bowie, and *E. Ellis Ott,* Bogalusa, Louisiana, on appeal only) for appellant.

*Clyde Fillmore,* District Attorney, *George W. Anderson, Jr.,* and *Alan B. Haley,* Assistants District Attorney, all of Wichita Falls, and *George P. Blackburn,* State's Attorney, Austin, for the state.

GRAVES, Judge.

Appellant and David Beck were charged by indictment with the unlawful killing of Thomas Houston Gibbons by "stomping and kicking the said Thomas Houston Gibbons with their feet, and by hitting the said Thomas Houston Gibbons with their fists, and by choking the said Thomas Houston Gibbons with their hands."

The appellant was placed upon his trial alone, and by the jury assessed the death penalty.

Upon the calling of this cause, appellant moved the court in writing to grant a severance herein and to place David Beck upon his trial first. This motion for a severance was granted, and David Beck assented to the court placing him on trial first. Whereupon the district attorney filed his motion in writing, setting forth the allegation that there was not sufficient evidence to convict David Beck, and moved the court to dismiss the indictment relative to David Beck in order that his testimony could be made available to the appellant. This motion was granted by the court and such indictment as to David Beck was

dismissed, and he was discharged thereunder. On May 19, 1949, a jury having been theretofore empaneled, this trial was begun as to Saucier alone.

Bill of Exception No. 1 complains of the action of the trial court in dismissing the indictment against David Beck, thus rendering him available as a competent witness for appellant herein and removing from his testimony the prohibitory Article 711, C.C.P. Appellant and David Beck were represented by the same attorney, and when Beck was placed upon the witness stand by such attorney, he refused to testify, giving as his reason therefor that, "I have to see proof that they will release me. * * * I thought it was a trick, because he tricked us. * * * Q. Now, if they dismiss that indictment against you, you will testify for T. C. Saucier? A. If they give me proof in writing that they won't have no charges *agin* me afterwards, that they won't file no charges *agin* me." He further testified that Mr. Ballard (who was the attorney for both appellant and David Beck), told him to say that. After further questioning, this attorney told Beck as follows:

"Now I tell you as your attorney at this moment if that indictment is dismissed, that you are a free man and you can walk out of this court room right now if you care to go. * * * Yes, sir, there are no charges against you. * * * I advise you as your attorney there is *no* charges against you."

Much testimony follows in the bill, but the main fact remains that the indictment against Beck had been dismissed by proper order of the court; and it is also evident that by the advice of this attorney, Beck refused to testify and did not testify relative to the facts herein. The grounds of such refusal seemed to be a fear of lack of good faith upon the part of the district attorney; we find no evidence of a fear of self-incrimination. In truth, Beck gave answers to questions as follows:

"Q. Yet you refuse to testify for him in view of the fact, or because you think that later on criminal charges may be filed? A. Yes, sir.

"Q. Is it because you think what you will testify to from that witness stand will incriminate you so charges will have to be filed again? A. No, sir."

In other words, the whole reason for the refusal of this

witness to testify was because he had been led to believe that this dismissal of his case was but a subterfuge and a trick; and that he would again be indicted after he had testified for the appellant.

This Bill of Exception No. 1 consists of 64 pages in question and answer form, certified as necessary by the trial judge, and continues in showing that upon such refusal by the witness, his attorney informed him as follows:

"Now I tell you as your attorney at this moment if that indictment is dismissed, that you are a free man and you can 'walk out of this court room right now if you care to go. A. I can go.

"Q. Yes, sir, there are no charges against you. A. Now?

"Q. If he sees fit to let you go, and the Sheriff of Wichita County. I advise you as your attorney there *is* no charges against you.

"Q. Will you testify for the defendant? A. No."

It is shown by the trial court's qualification that the witness was acting as though he intended to leave the stand, and the court room, and the court turned to the sheriff, who was nearby, and said: "Hold that man as a material witness." A deputy sheriff then took Beck into custody; the sheriff filed a complaint against him for this murder, and he was again placed in jail.

All these matters were offered on the ground of good faith in such dismissal of the original charge against Beck. This witness had refused to testify, evidently on the advice of his attorney, who also represented appellant, not on the ground of self-incrimination, but only because he was not promised perpetual immunity for the death of Mr. Gibbons.

It was said by this court in the case of Brown v. State, 42 Tex Cr. R. 176, 58 S.W. 131, 133, in commenting upon a similar case: "Whenever the application for severance is filed, two alternatives are open,—grant the request, else dismiss the prosecution, so appellant can secure the testimony. But certainly such dismissal must not have coupled with it a contract never, under any circumstances or conditions, to reindict the party whose case is dismissed. The party whose case is dismissed cannot ask this right."

Judge Henderson filed a dissenting opinion therein. Afterwards, in the case of Puryear v. State, 50 Tex. Cr. R. 454, 98

S.W. 258, the doctrine laid down in the Brown case, supra, was overruled, and it was there held that error was shown in dismissing the case against a codefendant without granting him immunity from further prosecution therefor. Soon thereafter, in the case of Hobbs v. State, 53 Tex. Cr. R. 71, 112 S.W. 308, three parties were indicted for the offense of murder. Hobbs made a motion for a severance and requested that his two co-indictees be placed upon trial first so that in the event of their acquittal, he could have the benefit of their testimony untrammeled by fear of any prosecution. The state answered by dismissing the indictment in so far as it related to such persons. The accused objected to such proceeding because it failed to grant such persons immunity from further prosecution thereunder, and cited the Puryear case, supra. However, that case was overruled in the following language: "Appellant claims that these proceedings were directly in the face of the holding in the case of Puryear v. State, 50 Tex. Cr. R. 454, 98 S.W. 258, 17 Tex. Cr. R. 721. To this contention we accede, and if the rule adopted in the Puryear Case should prevail we would not hesitate to reverse the case for the error here assigned. We do not believe, however, that the Puryear Case should be followed. We think the reasoning in that case is fallacious and unsound, the conclusion reached unsafe, and the result wholly mischievous. It is directly in the teeth of the decision of this court in the case of Brown v. State, 42 Tex. Cr. R. 176, 58 S.W. 131."

Again, the court said: "Suppose we reverse this case. Let us assume the most charitable view that Watson and Leggett are both innocent. It results that we send this case back to the district court of Hill county, with a message to the judge of that court that he is to go bravely through with the reassembling of the grand jury, that they may indict innocent men, for the purpose of having a formal order of acquittal entered, to the end that appellant may have the option, which so far he has not chosen to exercise, to offer these codefendants as witnesses on the trial of his case. As we say, we think that the Puryear Case is not supported by the intent and true meaning of our statutes. It is against the early decisions of the court. It is illogical in its reasoning, and it is evil, and only evil, in its results. So believing, we overrule the Puryear Case, and uphold and commend the action of the trial court in the matter complained of."

Also, in the case of Munoz v. State, 147 Tex. Cr. R. 212, 179 S.W. (2d) 566, the doctrine laid down in the Hobbs case, supra, is again followed, demanding, however, that such dismissal be made in good faith, the lack of which is complained

of herein by appellant. In that case the co-indictee was again indicted and returned to jail, but such conduct would not foreclose bad faith upon the part of the state. We quote therefrom as follows: *"That* fact that Flores, by his own testimony, implicated himself in the murder, which subsequently caused him to be re-indicted, would not justify the conclusion that the dismissal of his case was not made in good faith, nor would the fact that he was held in custody during the trial of appellant's case justify such a conclusion. He was a witness for the appellant, and if the District Attorney and the Court deemed it advisable to hold him in custody in order to secure his attendance in court during the trial, it would not authorize us to say that the dismissal of his case was to circumvent the law."

In the instant case, we think this matter rests upon whether or not this dismissal was had in good faith upon the part of the state, and the argument is offered by appellant that the fact that upon Beck being placed upon the stand and refusing to testify unless granted immunity and the judge ordering him to be held as a material witness, of itself evidences the bad faith of the state in such dismissal. The trial court explains such act by saying that there was some excitement evidenced, not only by the proffered witness, but also by spectators in the court room, and he thought the witness was about to leave the stand and rush out of the court room and he feared a disorder might follow therein; that he turned to the sheriff and told him to hold Beck as a material witness, which the sheriff did by filing a complaint against him. The witness had not offered a fear of self-incrimination, but demanded a full immunity, to which he was not entitled. That he was a witness to the killing of Mr. Gibbons was shown by all the witnesses to the transaction, and he was in a position to testify if he so desired. The trial court explains his action therein as follows:

"Q. Well you didn't make any statement about holding him as a material witness did you? A. I think I—here's what I think I told him. I either said, arrest or hold that man as a material witness, Ham, (Sheriff Hammett Vance) and then I said in the next breath 'I don't want any disturbance in this court room.' Because it appeared to me at the time that Beck would probably get off of that witness stand and run out, and if he did I knew there would be bedlam in here and I didn't want it.

"Q. Well, now what kind of bedlam could there have been, if this man was free to walk out? A. Well, as it appeared to me, things were pretty tense in here and the least little thing would have created probably a riot.

"Q. Well if he stood there a free man and there was no com- complaint against him— A. I am not arguing that point with you.

"Q. Well that's what I am getting at, and you as the judge trying that case told the sheriff to arrest or hold that man, didn't you? A. I wanted it, if he left this court room, to leave in an orderly manner.

"Q. Well the sheriff testified here, he testified that you told him in effect to hold that man or to arrest him? A. That's right.

"Q. As a material witness. Now, sir, what was he going to be a material witness for? A. I assumed that he was going to testify in this case.

"Q. Hadn't you heard him say that he refused to testify? A. I don't think at that time that you had gotten that far."

We think the trial court was correct, not only in maintain- ing order in his court, but that he also had the power to control this witness, who was certainly a material one, and could be punished by the court for his recalcitrancy, he never having refused to testify for fear of incriminating himself, but only demanding an immunity to which he was not entitled.

We also think this action of the trial judge did not evidence bad faith upon his part nor bad faith on the part of the state's attorney. Why should we be called upon to do the useless thing of sending this cause back to give appellant the privilege of using the testimony of David Beck, who has since been convicted and whose testimony cannot be used. See Hobbs v. State, supra.

Bill of Exception No. 2 is based upon the following circum- stances: It developed upon the trial that prior to this trial three of the state's witnesses had each told a different state of facts relative to the death of Mr. Gibbons from the facts testi- fied to by each upon this trial, thus causing them to be classed as accomplices by the trial court, and he charged the jury rela- tive thereto as follows:

"A conviction cannot be had upon the testimony of an ac- complice witness unless the jury first believes that the ac- complice's testimony is true and it shows the defendant is guilty of the offense charged against him, and, even then you cannot convict upon the accomplice's testimony unless it is corrobor- ated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

"Therefore, you are charged that Travis McLaughlin, Wilburn North and T. D. Pulley are accomplice witnesses, if any offense was committed; and you are instructed that you cannot find the defendant guilty upon their testimony unless you first believe that the testimony of the said Travis McLaughlin, or Wilburn North, or T. D. Pulley, is true, and that it shows the defendant is guilty as charged in the indictment, and even then you cannot convict the defendant unless you further believe there is other evidence in the case outside of their testimony tending to connect the defendant with the commission of the offense charged in the indictment; and then, from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty in order to convict him."

This portion of the charge was objected to in the following language:

"Paragraph 15 is a misstatement of the law, not full and complete and does not properly *appraise* this jury of the law, fails to present it fully and fairly *to* to this defendant and abridges his legal rights.

"Paragraph two of paragraph 15 especially is objected to because it refers to multiple accomplice witnesses without requiring the jury to find according to the established laws of this land under what circumstance, they may use the testimony of the accomplice witnesses and what weight they may give to them in the collective. That the corroboration referred to by the Court is not the proper guide, as a matter of law is not given to the jury as to these particular accomplices; vague, indefinite and there should be more limitations as a matter of law placed upon their testimony . . . . that the jury is not properly instructed back in paragraph 15 as to limitations which should be made on the testimony of the three accomplice witnesses in this case, and we request this Court to properly and legally instruct the jury as to the limitations placed as a matter of law upon the three accomplices singularly and not collectively.

"That the peculiar nature of this case is such that the witnesses North, Pulley, Travillion, (and) Beville, is such that their testimony should be limited and fully explained what the jury can use their testimony for and when they can use the testimony.

"That in a collective manner the Court has told the jury, but it should be broken down and the proper application should be submitted thereto specifically.

"We request that the Court limit the testimony of Beville and Travillion and tell the jury under what conditions they can use the testimony of Beville and Travillion and specially instruct the jury as to whether or not they are accessories and if so under what circumstance they may use their testimony and to what weight their testimony will have as to affecting the credibility of each of the accomplice witnesses, and do it singuarly and tell the jury under what conditions they can use those accomplices' testimony and for what purposes, and limit their testimony according to law, singularly and not collectively. That the Court should use the words that they must stand on their own bottom, and one cannot sustain the other in corroboration."

It now seems that appellant's attorney intended to object to this paragraph in the court's charge on the ground that the court should have told the jury that the testimony of one accomplice could not be used as corroboration for the testimony of another accomplice. However, we are impressed with the fact that it is difficult to find out just what appellant did desire the court to charge. Evidently the court was confused by the wording of such objection, and in an endeavor to accede thereto, he corrected such charge on the accomplices by telling the jury that they could not convict on such testimony of the three witnesses collectively, but he substituted for the conjunction "and" the conjunction "or" between the names of the three witnesses, thus instructing about them singly and not collectively, and telling the jury that they could not convict upon the testimony of one, or another, or still another accomplice unless such was believed to be true and properly corroborated.

It is observed herein that the state was not relegated alone to the testimony of such accomplices, and their corroboration. There were two other witnesses to this transaction who were free from any taint of accompliceship.

The state invokes Article 666, C.C.P., and says that if a failure to charge that one accomplice witness cannot corroborate another accomplice witness, that such, if error, was an inconsequential one, in that there were two other eyewitnesses to this transaction and that they gave substantially the same testimony as the three accomplices, and appellant offered no denial thereof. Therefore, it is contended that if error, such was not calculated to injure the rights of the defendant nor deprive him of a fair and impartial trial.

In the case of Haines v. State, 134 Tex. Cr. R. 524, 116 S.W. (2d) 399, we said:

"Consequently, the court's failure to instruct or submit to the jury the issue of whether or not Mitchell and Capps were accomplices could not have resulted in injury to the appellant's cause. It is true that the statute prohibits the conviction of one accused of crime upon the uncorroborated testimony of an accomplice, and, in a proper case, the instruction to the jury to that effect would have been necessary; and in some cases a failure of such corroboration would result in reversal. However, Article 666, C.C.P., forbids the reversal of a case for harmless error in a charge. Since it appears to us from the testimony that the court's failure to give an instruction on the law of accomplice witness was harmless error, we would not be justified in reversing the case on that ground alone. See Bogan v. State, 114 Tex. Cr. R. 468, 22 S.W. (2d) 944; Wilkerson v. State, 93 Tex. Cr. R. 50, 245 S.W. 430."

In the Bogan case, mentioned above, it is said: "A charge to the jury that the first witness was an accomplice and that a conviction could not be had on his testimony, unless true and corroborated, etc., if improper, could not have affected the result of the trial. The refusal of such charge would be deemed entirely referable to the class of cases comprehended by Art. 666, C.C.P., which forbids reversal of cases for errors or omissions in the charge unless same appear from the record to be of a nature calculated to injure the rights of the accused. In Fisher v. State, 81 Texas Crim. Rep. 571, Judge Morrow says that the testimony of the witness who claimed to be an accomplice was but cumulative of other testimony showing the accused a dealer in intoxicating liquor, and under the article of the statute last mentioned, reversal would not be authorized for refusal to tell the jury that such witness was an accomplice."

Bill of Exception No. 3 contends that two further witnesses, Beville and Travillion, were accessories, and the trial court was requested herein to charge that if they were such accessories, under what circumstances the jury might use their testimony and what weight should be given thereto, *singularly* and collectively. Mr. Beville had been committed to this hospital as an alcoholic for a 90-day treatment under the statute permitting such treatment, Article 3193o-1, Vernon's Revised Civil Statutes, (1948), Vol. 1, p. 1048. Beville was present when Gibbons was brought into the linen room and ordered to change his clothes. He made inquiry of Gibbons as to the size of his trousers but Gibbons did not answer him. This witness saw the whole transaction and helped carry the dying man into the "screen room" and place him on a bed. Beville was committed to this hospital,

but at the time of the trial, he had been discharged and lived in Amarillo, Texas. A judgment of restored sanity had been entered. If there was any reason to denominate this witness an accessory, we fail to find such.

Mr. Travillion was a patient at this hospital at the time of the homicide. He had a job in the linen room, and came into the presence of the deceased for the purpose of taking his clothing, wrapping them up in a sheet, and checking them away. Mr. Gibbons took off his hat and said, "Well, I will get my clothes off," but was a little slow in doing so. Appellant then grabbed him and a struggle began. Travillion detailed about the same state of facts as the other state's witnesses. He had nothing to do with the struggle, and seemed to have said nothing. When the struggle was over, he mopped the blood off the floor. There was no further connection of this witness with this homicide. He did not conceal the offender nor give him any other aid in order that he might evade an arrest or trial or the execution of his sentence. It is also shown that at the time the witness' testimony was given, his sanity had been restored by a proper court order. We therefore overrule this bill.

Bill No. 4 is the court's bill relative to the testimony of Dr. J. L. Goforth, who performed an autopsy upon the body of the deceased. Dr. Goforth was employed by the widow of Mr. Gibbons, and while testifying, he referred at times to his written report for certain minutiae of this examination. While the doctor was testifying, appellant's attorney said in effect that he requested the court to furnish him with a copy of the autopsy report so that he could more closely follow the questions propounded by the district attorney to the doctor. The doctor then informed the court that this autopsy was made under the order of the widow of the deceased; that she employed him, and that he had given her a copy thereof; that he had no other copy save his own; that the widow could do as she pleased with her report thereof. Thereupon the court refused to order the district attorney (who was using a copy thereof to question the witness), to turn this report over to appellant's attorney. This attorney, neither then, nor when he took the doctor on cross-examination, ever requested the trial court to order the doctor to permit him to see this report, nor did he ask the doctor therefor; that during the examination of the doctor, this attorney stood immediately behind the witness and could see, and appeared to peer over the doctor's shoulder, who made no effort to conceal the report. This autopsy report was not testified from, the doctor using his independent recollection as to what he found, but he did refer to

the report from time to time to corroborate himself on details for measurements or statistical figures. The doctor refused this copy on his own and no one else's suggestion, and would gladly have given the attorney a copy had he been directed to do so by the widow of the deceased. It seems that appellant's attorney was in a position to see this report, and his failure to receive a copy thereof could not have affected the appellant's rights in any way. The same was not introduced in evidence, but was merely used at times to aid the doctor's memory in his accuracy as to measurements and details.

Bill No. 5 relates to the action of the court in sustaining the state's objection, while the witness Allen N. Beville, an eye-witness to the homicide, was on the stand to the following testimony: mony:

"Q. Were you declared insane? A. The jury said I was, I don't know whether I was or not, I don't think I was."

The above-quoted answer was excluded from the consideration of the jury, and such exclusion is made the basis of this exception. The qualification to the bill shows that Dr. Mackechney, superintendent of such hospital, had testified before the court outside the presence of the jury, that he was acquainted with this patient and that in his opinion he was mentally sane and could rationally relate incidents and occurrences witnessed by him on March 4, 1949 (the day of the tragedy), and that he was mentally competent at the date of the trial, at the time he was offered as a witness. To the same effect is the testimony of Dr. I. W. Fires, an employee of such hospital. The trial court found therefrom that Beville was a competent witness. The question objected to and excluded, which is the basis of this bill, is found in the testimony of Beville, as shown in the bill itself, as follows:

"My name is Allen N. Beville, my home is in Amarillo, Texas, I am fifty-four years old and I have been out here to the Wichita Falls State Hospital. * * * I do not know what kind of a commitment it was, it was as an alcoholic. That's what I have been. I was out here at the Wichita Falls State Hospital on the 4th day of March of this year."

On cross-examination the witness testified:

"I was suffering from alcoholism. I was in the business of exporting lumber in Amarillo. I had this jury trial in February in which I was committed. I was adjudged insane by a jury, I

don't know what diagnosis was placed on me, they testified as to what was the matter with me. Well, I don't know whether I was insane or not, I wouldn't have done some of the things I did do if I hadn't of been crazy drunk. The jury said I was insane, I don't know whether I was or not."

On redirect examination the witness testified as follows:

"I think I was committed on a jury trial, I don't know how many days I was committed for, in 90 days they generally release them and this is the 88th day.

"I am not testifying to anything here because I think it will help me get out of that hospital."

We think it is evident from the testimony of the witness that he was a qualified witness. See Nations v. State, 91 Tex. Cr. R. 112, 237 S.W. 570; Singleton v. State, 57 Tex. Cr. R. 560, 124 S.W. 92.

The question of the insanity of the witness Beville is one wholly for the trial court in determining the competency of the witness. There is no presumption that the insanity shown to have existed has continued down to the date of the trial. Such a question is a judicial one, and we may indulge the presumption in support of the court's ruling that he had before him at the time such facts as properly showed the declarant competent, especially in the absence of a showing to the contrary in the bill. See Downing v. State, 113 Tex. Cr. R. 235, 20 S.W. (2d) 202. However, if appellant was entitled to the complained of excluded testimony, we think the above excerpts from the testimony of the witness Beville showed conclusively that he was still under treatment at the State Hospital, and would thus render nugatory any objection shown in Bill No. 5.

Bill No. 6 is similar to Bill No. 5 except that it relates to the testimony of Desmond Travillion wherein he was asked the question: "Were you getting treatments for that insanity out there?" Under an objection of the state's attorney, the witness was not allowed to answer the question, but had he been allowed to do so, he would have answered: "Yes, I was receiving treatments for insanity out at the State Hospital." The bill shows that this witness received the same examination by the two doctors at the hospital, and was declared by them to be sane and able to correctly observe and relate occurrences at both the date of the homicide and at the time of the trial. We

find from the record that the witness had already testified as follows:

"I was a patient out here at the Wichita Falls State Hospital on the 4th day of March of this year, and I was admitted to that hospital on January 4th from Collin County jail at McKinney, Texas. * * * I live at McKinney, Texas, I was a bank clerk and I had that official capacity for about two years, I got in trouble with the law for drinking; there were never any charges against me for anything excepting for drunkenness. I went to the hospital for a nervous break down. I was an inmate of that institution adjudged insane by a jury. I received two shock treatments. I was admitted to the hospital on January 4th and I was released on April 4th."

We think the testimony complained of, which was refused, finds itself in the above quotations from Travillion's testimony and renders harmless the exclusion of the testimony complained of herein.

Bad faith upon the part of the state in its dismissal of the Beck indictment is alleged by appellant's attorney, and bad faith upon the part of appellant's attorney is alleged by the state. It is true that Beck was not finally discharged therefrom, but it is also true that appellant filed an affidavit for a severance, alleging that he believed that there was not sufficient testimony to convict Beck whose evidence was desired by appellant, whereupon the case against Beck was dismissed. Appellant's attorney, being also the attorney for Beck, was proffered the witness Beck free from the indictment. However, his duty to Beck seemed to have caused him to tell Beck that he thought the dismissal was a trick, and under such advice Beck refused to testify unless granted immunity against ever being tried for this homicide. This attorney seemed to be torn between two emotions, one his loyalty to appellant and his desire to have Beck's testimony, the other an effort to obtain immunity for Beck, also his client. We think the state pursued the only course open to it under the law.

Since the above opinion has been written, we are in receipt of a belatedly filed "First Supplemental Brief" relating to a certain affidavit filed by Beck and attached to the state's controverting motion for a new trial concerning the reasons why he (Beck) was caused to refuse to testify upon this trial. An objection is made in such brief by appellant's attorneys to our consideration thereof for various reasons. Suffice it to say that no mention will be found herein to such affidavit, nor have we alluded to nor considered same in any way.

The facts herein are gruesome and will be briefly alluded to. The deceased was declared insane in Hopkins County and taken to the State Hospital at Wichita Falls. He was taken into the office and registered. He was then turned over to appellant and another to be bathed and clothed. The deceased seemed to be fumbling at his shirt collar, when appellant struck him in the stomach. Deceased bent over and appellant knocked him down, stomped him, kicked him in the stomach, and beat him with his fists. Beck also kicked and stomped the deceased. They then took him into the bath room and there they again knocked him down and both men stomped him. They finally placed him in the bath tub, and being told that he was dying, appellant grabbed him by the hair, lifted his head and splashed water in the deceased's face. They immediately moved him into another room where he soon died. The doctor who performed the autopsy testified that the deceased's stomach was torn in two; that he had many multiple bruises; and that the stomach wounds could have been inflicted by stomping with one's feet.

While the verdict is a severe one, it is provided by law, and we cannot interfere with it.

We find no error shown herein, and the judgment is affirmed.

ON APPELLANT'S MOTION FOR REHEARING

WOODLEY, Judge.

After the trial court, in response to the motions of appellant and his co-defendant Beck had ordered a severance, and directed that Beck be first tried, the state's motion to dismiss as to Beck was granted.

The motion for dismissal upon its face shows that affidavit had been made and filed by appellant stating that there was not sufficient evidence to convict Beck, and that his testimony was material for appellant's defense. Such motion and dismissal is specifically authorized by Art. 653, C.C.P., and after such dismissal, Beck was available as a witness for appellant under the statute.

But appellant insists that the prosecution was not in good faith in such dismissal, because Beck was held in custody, and thereafter was charged and convicted for the murder.

We cannot agree with such contention. Beck was held by order of the trial judge as a witness. He was not at the time

of the trial charged with the offense, the indictment having been dismissed, and no new charge having been filed. Beck was therefore available as a witness, and was in no way discredited before the jury. Beck was then in the same position he occupied before any charge had been filed against him in connection with the death of Mr. Gibbons. He was entitled to no more.

Appellant was entitled to Beck's testimony free from discredit by indictment or other form of accusation in connection with the murder. Neither appellant nor Beck was entitled to have Beck immune from future prosecution for the offense. See Hobbs v. State, 53 Tex. Cr. R. 71, 112 S.W. 308.

In Smith v. State, 55 Tex. Cr. R. 326, 116 S.W. 572; and Manor v. State, 45 Tex. Cr. R. 370, 77 S.W. 786, relied upon by appellant, complaints had been filed following the dismissal of the indictment against the co-defendants and this court held that the accused was entitled to their testimony free from discredit by such charges.

Here, Beck was held only as a witness, and was not in any manner charged with the murder when called as a witness at appellant's trial.

We cannot agree that the holdings of this court, to the effect that immunity from future prosecution is not required in connection with a dismissal against a co-defendant under the provisions of Art. 653, C.C.P., violate the due process clause of the Constitution of the United States.

Appellant's contention that Beck's punishment was assessed at only five years in the penitentiary in his trial, whereas appellant received the extreme penalty, shows that he has been deprived of the equal protection of the law, or that appellant's sentence of death as compared to Beck's sentence amounts to cruel and unusual punishment as defined in the Constitution of the United States, Amendment 8, is not sustained. Appellant's punishment was a matter for the jury if within the range provided by law for the offense, and the evidence is deemed sufficient to support it. Beck's punishment was assessed at another trial, by another jury, and must be judged by the evidence there, not the evidence upon appellant's trial.

We cannot agree that the prosecuting officers were responsible for the effort of appellant's attorney to secure immunity for Beck from future prosecution or for his contention that appel-

lant was entitled to have Beck's testimony while so immune. The dismissal was ordered as provided by the statute following severance. Appellant alone was upon trial. We do not agree that the act of the prosecuting officers in moving to dismiss, as authorized by the statute, can be construed to have deprived appellant of the full benefit of counsel in contravention to the Sixth and Fourteenth Amendments to the Constitution of the United States.

Appellant also insists that he did not have the full and undivided assistance of counsel in his trial in contravention of the due process clause of the Constitution of the United States.

He directs attention to the fact that the one attorney who represented him at his trial was also the sole attorney for his co-defendant Beck.

It is contended that a serious conflict of interest developed on the trial, the interest of appellant being to secure Beck's testimony, and the interest of Beck being not to testify for appellant unless he was given immunity.

Appellant alone was on trial, and was represented by counsel of his own choosing. Authorities relied upon under fact situations where more than one accused was on trial, represented by a single attorney acting under appointment of the court, are not deemed applicable.

Counsel who represented appellant on his trial, like other counsel representing him on this appeal, took the position that reversible error was committed by the trial judge in putting appellant on trial without Beck having been tried or granted immunity.

In order to perfect the record so as to present such contention to this court, and not for the purpose of having him testify as a witness to the killing, Beck was called to the stand with instructions from the attorney to refuse to testify unless granted immunity.

Though we overrule the contention so raised, we are not impressed with the suggestion that trial counsel failed in his duty to appellant by such procedure.

There is no showing that Beck's testimony would have been helpful to appellant, nor is it shown what Beck's testimony

would have been if he had testified. But it is shown that Beck did not refuse to testify because he thought that his testimony would be self-incriminating.

We cannot agree that appellant was deprived of the assistance of counsel as guaranteed under the Constitution.

The case against Beck having been dismissed before appellant's trial began, clearly the trial court would not have been justified in depriving appellant of the services of the attorney of his choice by declaring on his own initiative that such chosen attorney was disqualified because he was also the attorney for Beck. We think that he was not disqualified, and that his effort to have Beck tried first or have him granted immunity, as well as his calling Beck to the stand with instructions to refuse to testify, was in the interest of appellant.

We were in error in our original opinion wherein we said that the witness Beville was committed to the State Hospital under a ninety day commitment as an alcoholic, and at the time of trial he (Beville) had been discharged, and lived at Amarillo, Texas, a judgment of restored sanity having been entered.

Beville was committed on a lunacy judgment (he said he was an alcoholic) and was still in the hospital at the time of trial.

Desmond Travillion, another patient who was an eye witness, had been committed on a lunacy judgment, but prior to the trial a judgment of restored sanity had been entered.

The competency of these two patients being challenged, the trial court heard the testimony offered, including the testimony of doctors attached to the staff of the State Hospital, and held the witnesses to be competent. The testimony so heard appears to sustain and justify the trial court's ruling.

Art. 708, C.C.P., provides that only insane persons who are in an insane condition of mind at the time when they are offered as witnesses, or who were in that condition when the events happened of which they are called to testify, are incompetent.

A prior judgment and commitment for lunacy does not in itself disqualify the witness. See Downing v. State, 113 Tex. Cr. R. 235, 20 S.W. 2d 202; Singleton v. State, 57 Tex. Cr. R. 560, 124 S.W. 92; Foster v. State, 142 Tex. Cr. R. 615, 155 S.W. 2d

938; Ebers v. State, 129 Tex. Cr. R. 287, 86 S.W. 2d 761; and Flannery v. State, 153 Tex. Cr. R. 36, 216 S.W. 2d 980.

The admissibility of the testimony of the allegedly insane witness is to be determined by the trial judge, and it is proper that evidence be heard on such issue in the jury's absence. See Nations v. State, 91 Tex. Cr. R. 112, 237 S.W. 570; and French v. State, 98 Tex. Cr. R. 578, 267 S.W. 494.

The trial judge having admitted the evidence upon his finding that the witness is competent, the credibility of the testimony so offered is for the jury.

And in passing upon such testimony the jury is entitled to hear evidence as to the mental status of the witness including his commitment as a lunatic. See Ebers v. State, supra.

Appellant contends however that the witness Beville was not a competent witness by reason of his insanity commitment, and of the provisions of Sec. 1, Art. 5, of the Constitution of Texas. As we understand, appellant's position is this: Art. 5, Sec. 1, of the Constitution of Texas provides in part that oaths and affirmations shall be taken "subject to the pains and penalties of perjury." Art. 309, P.C. provides punishment of death for a witness who testifies falsely to a material fact tending to produce conviction when death is assessed and is suffered by the accused. Art. 34, P.C. provides that no act done in a state of insanity can be punished as an offense. It is therefore contended that the witness Beville, because of his commitment, cannot be convicted of perjury, and hence is incompetent to testify.

A judgment of insanity against a person accused of crime does not establish that he is in fact insane at a later time, but merely raises a presumption of insanity contrary to the ordinary presumption that every person is sane. The question of sanity or insanity is a question of fact, and the controlling issue that determines the accountability of the accused for his acts, is the fact question as to his sanity or insanity at the time of the act charged.

We overrule appellant's contention and hold that the trial court was not in error in his ruling regarding the competency of Beville and Travillion as witnesses.

Bill of Exception No. 5 sets out the testimony of the witness Beville offered by the state before the jury. It is shown that

the witness testified regarding his commitment to the State Hospital in part as follows:

"I do not know what kind of a commitment it was, it was an alcoholic. That's what I have been."

Beville then testified and gave a full eye witness account of the killing.

Upon cross-examination, Beville was asked "Were you declared insane?" to which he replied, "The jury said I was, I don't know whether I was or not, I don't think I was." Thereupon, the state objected as follows: "We are going to object to him going into this, the witness has been declared competent to testify for the court."

Appellant's counsel, in answer to said objection by the state, then remarked, "Now Your Honor that's a matter of law and goes to the weight, just give me a full bill and I will sit down." The court assented to the suggestion, sustained the objection, and excluded the answer, to which appellant excepted.

In his qualifications to this bill, the trial court certifies as to the hearing in the absence of the jury, and sets out the testimony and opinion of the witness heard by him in the jury's absence, and his conclusion both from the testimony and the appearance and demeanor of the witnesses, that the witness was sane, and competent. He further certifies that the witness' account of the happenings at the hospital on the day of the killing was understandable and intelligent, and that no testimony was offered to refute the testimony of the state's witness regarding the competency of the witness, nor to show that Beeville was incompetent.

The competency of the witness was for the court and that issue had been forecelosed against appellant prior to the examination of the witness before the jury.

However, the credibility of the witness, and the weight to be given his testimony was for the jury. And upon this question, appellant had the right to offer evidence before the jury as to his insanity or the extent of his impairment of mind, and to fully cross-examine the witness upon the character of his commitment. See Bouldin v. State, 87 Tex. Cr. R. 419, 222 S.W. 555; Mason v. State, 74 Tex. Cr. R. 256, 168 S.W. 115.

Bill of Exception No. 6 raises a like question arising in the examination of the witness Travillion.

Travillion testified on cross-examination that he was adjudged insane and committed to the hospital on January 4, 1949, and was released on April 4th. He further testified that he received two shock treatments. He testified that he was not in the hospital on a 90-day commitment, but was released in 90 days.

Travillion testified further that he had gone into court and had his sanity restored by judgment. He testified that he was in full possession of his normal faculties on the date of the killing and that everything that happened was clear to him then and at the time he was testifying.

Appellant was entitled to cross-examine, before the jury, these witnesses whose competency he had theretofore attacked, on the question of their credibility and the weight to be given their testimony by the jury.

It appears, however, that the witnesses were examined by appellant's counsel and testified before the jury fully regarding the matter covered by the excluded answers as shown in Bills Nos. 5 and 6, and therefore no injury is shown by these bills.

We remain convinced that there was no sufficient exception to the omission from the court's charge of an instruction to the effect that one accomplice cannot corroborate another. No doubt this omission would have been supplied if the trial court's attention had been called to it.

The facts show an unprovoked and wholly unjustified, wilful killing of an unfortunate old man whose reason had been dethroned, and whose custody and welfare had been placed in the hands of appellant and his co-workers. It was their duty to care for him until he regained his sanity and his freedom.

However, according to the evidence, his life was destroyed by his keepers in a cruel and gruesome manner.

The jury meted out the extreme penalty as punishment for the murder, and we are not able to say that they were not authorized to do so under the evidence.

No reversible error being shown, appellant's motion for rehearing is overruled.

Opinion approved by the court.