Mannesmann HANDEL, Appellant,

v.

The LONG TRUSTS and Armco National Supply Company, Appellees.

No. 9624.

Court of Appeals of Texas, Texarkana.

Aug. 23, 1988.

Michael A. Hatchell, Tyler, Rick Lee Oldenettel, Oldenettel & Wauson, Houston, for appellant.

Ron Adkison, Wellborn, Houston, Adkison, Mann, Sadler, Henderson, for appellee The Long Trusts.

Brent Howard, Grainger, Patterson, Howard & Colley, Tyler, for appellee Armco Nat. Supply Co.

PER CURIAM.

The Long Trusts brought an action against Mannesmann Handel (hereinafter referred to as Handel) and others for damages allegedly caused by defective materials. The Long Trusts were awarded a judgment and Handel appeals.

Handel brings four points of error contending that the trial court erred: (1) in allowing an undisclosed expert to testify over objection, (2) in granting Armco Steel's motion for a directed verdict dismissing Armco from the case, (3) in excluding the deposition testimony of Bill Cox, and (4) in excluding deposition testimony of Pete Long.

The Long Trusts are engaged in oil and gas exploration. Their exploration activities have been contracted out to various operators. The Long Trusts purchased from Baron–Guernsey Pipe Corporation (hereinafter referred to as Baron–Guernsey) 11,200 feet of five and one-half inch casing, which was shipped to America for Baron–Guernsey by Handel. Both Baron–Guernsey and Handel are distributors of the pipe. Using this casing, the Long Trusts drilled an 11,190 foot well. They

had negotiated a guaranteed gas sales contract on the sale of gas produced by the well for $5.77/mcf. During the completion of the well, the casing string bent, buckled, or collapsed, causing the casing to be wedged in place so that it could not be moved. Tools could not be moved down inside the casing string, and oil and gas could not come up through it. After attempts to remove the casing string failed, the Long Trusts moved eighty-five feet and drilled another well which was successfully completed about nineteen months after the failure to complete the first well.

The Long Trusts' action is based on a theory that the casing was defective. Handel defended on the theory that the pipes' buckling or collapsing was caused by "slacking off" the tubing, which reduced the weight at the wellhead and allowed the pipe to bend within the shaft. Extensive testimony was offered about the amount and effects of "slacking off."

The Long Trusts sued for the cost of the unsuccessful pulling operation ($217,-123.41), and the cost of redrilling ($484,-540.67). The Long Trusts also sought damages for the economic loss caused by the nineteen-month delay. Because of the failure of the first well, the gas sales contract terminated, and by the time the second well was completed, the available market price for natural gas was approximately one half of the previously guaranteed price.

Based upon jury findings, a judgment was rendered against Handel and Baron–Guernsey for $1,601,664.07 plus prejudgment interest, providing a total recovery of $2,141,135.40. All other defendants and cross-defendants were removed from the case by directed verdict.

■ Handel's complaint about the admission of the expert opinion testimony of P.D. Fitzgerald is based upon the Long Trusts' failure to disclose Fitzgerald as an expert witness in accordance with Tex.R.Civ.P. 166b and 215. Fitzgerald had been named as an expert witness by Hinton Drilling. (Hinton Drilling was later removed from

the trial by an instructed verdict.) No objection was made by Handel when Fitzgerald was called by the Long Trusts to testify by deposition. At that point in the trial, Handel also read from the expert's deposition.[1] Handel waived its right to complain about Fitzgerald being called as a witness by the Long Trusts by not objecting when the Long Trusts first called him as a witness through his deposition.

■ Next we address Handel's contention that the trial court erred in granting Armco's motion for a directed verdict. The undisputed testimony indicated that Armco's work was done under the supervision of the Long Trusts and that the decisions regarding "slack off" of the casing were made by the Long Trusts. Furthermore the testimony indicated that Armco performed its work in a workmanlike manner, and there was no evidence to show that Armco in any way failed to perform properly the setting of the slips. No res ipsa loquitur contention was filed against Armco, and there was no showing that the damage in question occurred during the work being performed by Armco. We find that the trial court properly granted an instructed verdict on behalf of Armco.

■ Handel next contends that the trial court's exclusion of a portion of the Bill Cox deposition is harmful error. Bill Cox was an employee of the Long Trusts and worked on the well in some unspecified capacity. The court excluded two lines of Cox's deposition:

Q Okay. So the casing was allowed to bo gack (sic) down the hole some?

A Yeah. Maybe, you know, 10 inches, 12 inches, 2 feet.

The Long Trusts objected to this testimony on the basis that Cox was not present during the occurrence in question, and therefore could have no personal knowledge of the event. At the time of the trial court's ruling, the record did not indicate whether Cox had been present, but later on in the trial, testimony was offered from

1. Western Company, Armco, W.B. Hinton Company, and Offshore Casing Crews also offered

testimony from Fitzgerald's deposition.

Cox stating specifically that he had no personal knowledge of the occurrence on that particular well. In his argument to the trial court, Handel contended that Cox was the chief engineer for the Long Trusts, and the record also indicates that Cox was one of the persons supplying the answers to the interrogatories propounded to the Long Trusts by Handel. Handel, however, in introducing this evidence only offered evidence showing that Cox had been employed by the Long Trusts for four years. They offered no other evidence to try to establish Cox as an expert. If Cox had been established as an expert, he could express an opinion without personal knowledge inasmuch as Tex.R.Evid. 703 is specifically set forth as an exception to Tex.R.Evid. 602, which requires personal knowledge.

■ Handel also contends that this testimony was an exception to Rule 602 under Tex.R.Evid. 801(e)(2) as an admission by a party-opponent. To be admissible as made by a third party on behalf of a party-opponent, the statement must be made by an agent or servant concerning a matter within the scope of his agency or employment and made during the existence of that relationship. The record does not show that the matter was within the scope of Cox's employment. Thus, the trial judge properly excluded this evidence.

■ Handel next contends that the trial court erred in excluding the deposition testimony of H.L. "Pete" Long. Pete Long was the settlor of the Long Trusts. When Handel first sought to take Pete Long's deposition, the Long Trusts filed a motion on April 29, 1987, for protection, which was granted by the trial court. The motion asserted that Long was not physically and mentally able to attend a deposition at that time. This motion was accompanied by an affidavit in which Dr. John Ruland swore

that "Long's physical and mental condition is such at this point that he cannot safely appear in trial or deposition and give testimony." A notice of hearing was apparently filed on May 22, 1987, on a motion to compel production of witness or for an independent medical examination, although the motion does not appear in the record. The trial judge apparently granted this motion and ordered an independent medical examination by Dr. W. Mike McCrady, although this order also does not appear in the record.[2]

On June 10, 1987, Handel moved to compel the production of Pete Long as a witness on the basis that Dr. McCrady's examination showed that Long was not suffering from any acute or critical medical condition and that the taking of his deposition would not be detrimental to his health. The court granted this motion and permitted the deposition to be conducted under the supervision of the court for a period of time not to exceed one hour.

At the trial, the court excluded the Pete Long deposition in its entirety, stating:

I'll receive the Plaintiffs' Exhibit 1–B.E. for the purposes of this Bill of Exception and would add, for purposes of the bill, that the Court did take into consideration, took judicial knowledge of this exhibit, and having read the exhibit, at the time that the Court excluded the deposition of Pete Long.

Further, the Court record should show that the Court did review the deposition testimony offered by Mannesmann Handel prior to making that ruling and determining to exclude it.

Exhibit 1–B.E., to which the trial court refers, is the letter from Dr. McCrady reporting to the court his findings after examination of Pete Long.[3]

---

**2.** This order is referenced by a motion to compel production of Pete Long for the taking of a deposition. The motion states that the court had ordered an independent medical examination of Long, which had been completed.

**3.** Pertinent parts of Dr. McCrady's letter are as follows:

Review of Mr. Long's past medical history reveals that he had been in quite good health

throughout most of his life. He relates most of his problems to a time around 1984, although he is not exactly sure of the exact date when a motor vehicle accident happened at that time ... He states that he was injured quite severely in the accident and required ICU care for 10 days due to left rib fractures and a right broken leg. He was then hospitalized for an additional one week and then sent home where he was at

The following colloquy occurred outside the presence of the jury:

bedrest for approximately 3 months. Over the subsequent one year he states that he suffered two light strokes which resolved almost completely except for slight dimness of his vision ... Social history reveals that he has worked as a salesman and a chemical engineer. He was very unsure about the dates and exactly who he had worked for. He just remembered those two jobs. He has run his own company for some period of time now as the manager and exploration director of an oil company. He now states that he goes into the office about two to four hours per day and helps out in the management of the company. His wife relates that he is not allowed to make any important decisions. He is really there as a figurehead. Throughout the entire interview, Mr. Long was constantly referring back to events which happened in the distant past, mainly in the 1950s and 1960s at which time he has quite good recall of general events although specifics, names, places, dates and actual exact occurrences he tends to gloss over and refuses to go into. He broadly generalizes about events and will talk at length about various major issues without really being specific at all about them. Anytime a difficult question is asked, he manages to steer the conversation back to these areas where he feels more comfortable and tries not to answer questions about the present.

... He is 80 years old ... mental status examination was undertaken using formal mental status testing. His testing to orientation reveals that he did know his identity exactly including birthdate, year and day of birth, where he was born and as stated above, many of the particulars of his life. He did know where he was at this time, although he did not remember my name after halfway through the interview. He did understand this was a doctor's office and he was here for the state of purpose (sic). His orientation to time was very inexact, he thought it was January and then he tried to guess a few times to get the right month. He was fairly accurate on the season, but it was obvious he was guessing. His mood appeared to be upbeat. He did not appear to be depressed or saddened and he did not appear to have any unusual thoughts of perception, suggesting a major psychiatric disorder. Memory testing revealed that his immediate memory was quite good. He could remember a list of words and numbers, six forward and four backwards, which is a completely normal immediate recall. He can do simple calculations quite well and was very adept with calculations and mathematics and numbers which he and his wife both stated had always been his strong suit. On questioning his recent memory, current events, he had almost no memory at all of the news events of the day and those he did remember were very sketchy and he tended to relate them back to past experiences quite quickly. He could not remember any of three objects that were presented to him and asked to recall three minutes later and even

with coaxing it took a great deal of help before he even had an idea of what we had talked about.

This is evidence of an obvious severe deficit in recent memory which denotes a severe defect in storing of information although it can be captured and thought about, the difficulty lies in storing the information so that it can be recalled later and this is his major weakness at this point. His judgment was tested with proverb questioning. His answers were very concrete. He had no insight into the complexity of judgment required to answer proverbs appropriately. *He did seem to have the capacity to understand basic moral principles and the understanding of right and wrong was intact.* My conclusion concerning Mr. Pete Long is that he has suffered a steady deterioration over some number of years, probably four to six, during which time he has suffered multiple small cerebral vascular accidents, otherwise known as strokes. These have resulted from narrowing of the arteries which go to the brain and resulted in lowered oxygen and blood flow to the brain, causing the loss of neurological functions due to the loss of the cells which carry out these functions. His greatest area of deficit at present is the ability to store information and recall it later in a useful manner. He has stored a great deal of information during his life, but it is very difficult for him to recall it in a systematic manner and use it as we use memory everyday. This is an irreversible change and not treatable and as his family has already noticed is becoming progressive. As to the present question I feel that (1) his general health is adequate to undergo a routine examination in Court or by deposition as long as no undue stress is put upon him either mentally or physically. I would think that a period of questioning of no more than one hour would be appropriate in an elderly gentleman who has limited mental capacities. Going beyond that would put him at undue stress and significantly endanger his health due to anxiety it would provoke. Secondly, I feel that any questioning which is done directed toward events in the past will have to be considered in light of his memory deficit. *There are areas of his memory which are functioning properly and this would basically be related to areas of his mind which were functioning appropriately at the time of an event. Therefore, if he can recall appropriately known facts which occurred at a particular time, then his testimony about a particular incident which occurred at the same time should be considered as factual if it is corroborated by the other facts which are known to have occurred at the same general time.* Based upon the questioning I did of him about the accident that occurred in 1984, I do not think that he has any significant recall of this event and will probably not give any reliable information concerning this event. (Emphasis added.)

MR. OLDENETTEL: The thing, I guess, we need to take up now, then, before the Jury comes back is the Pete Long question.

. . . .

MR. ADKISON: I don't have any idea what it is he wants to ask. If he wants to ask how old he is and where he lives, I don't have any problem with that.

MR. OLDENETTEL: I intend to read a portion of Pete Long's deposition.

THE COURT: Do you have that deposition?

MR. OLDENETTEL: The portions where he talks about the fact that they did this well just like they did all the other wells. And he talks about the fact that if you slack off too much you can have a problem. And they do slack off routinely. And he said he didn't remember this particular well in particular, but they did this one like all the others, and they normally slacked off about 50 percent of the weight, which is exactly what Dr. Wooley has proven to be the crucial amount of weight involved in this collapse, buckle, or whatever we call it.

At this point, the court requested Mr. Oldenettel to identify the pages and lines that he wished to read, and Mr. Oldenettel did so. The court then asked if there were any objection. Mr. Adkison objected to the omission of certain lines from the testimony, then objected to one of the questions as leading. Then, he made the following objection to the court:

MR. ADKISON: ... Couple that with the report that the Court's got in the file, it's just going to cloud the issues. I am going to have to go call Dr. McCrady over here and let him testify that the man can have no recall of this event. We are going to be here from now on.

. . . .

MR. ADKISON: He keeps saying in here that you don't slack all the way off, you don't slack off too much because you would be cementing right on bottom. He talks about—if you read the entire text of it, it has no—doesn't aid the Defendant any, but it's going to require us, in that context, to go over and get the

doctor to come back over here, because notice the way he starts out all of these questions. He says, "I want to ask you about wells generally, not any particular well." He said, "Did you do this one like you did the rest of them?" And you've got a doctor's affidavit in your file that says if there is not something that refers him directly to a specific event, that you can correlate that he remembers that particular event, itself, you can't rely on anything that he says because he tries to correlate events, and he covers very well in conversations unless you ask him very specific questions. It would put me in the position of having to call a doctor to a witness stand and in this trial and prove that Mr. Long doesn't have sufficient mental capacity to take the oath, and there is no sense in subjecting him and his family on that.

The court responded by sustaining the objection as follows:

THE COURT: I have reviewed all of the testimony of Pete Long that you propose to offer, and I'm going to sustain the objections to it. I will exclude it. I will receive it for purposes of a bill, if you wish to present it for that purpose.

Later in the proceeding, the Long Trusts offered Exhibit 1–B.E. (without objections), which is the report of Dr. W. Mike McCrady. Mr. Adkison stated as follows:

MR. ADKINSON: I offer Plaintiffs' Exhibit No. 1 and ask that the original in the Court's file, which is pursuant procedurally raised in this case by motion for protection and order of the Court for independent medical examination be attached to the record of this case and submitted for the Appellate Court to review whether or not Pete Long's deposition would have, in fact, played any part in this case and whether, in fact, any expert's reliance on Mr. Long's deposition would further weaken the case of the Defendant.

In summary, the Long Trusts objected to the admission of Pete Long's deposition on the basis that the witness was incompetent, and the trial court sustained the objection based upon information contained in Dr. W.

Mike McCrady's letter and in the deposition itself.

Rule 601 of the Texas Rules of Evidence deals with the competency and incompetency of witnesses. This rule provides that every person is competent to be a witness except as specifically provided in the rules. Subsection (a) provides two categories of witnesses who are incompetent to testify:

(1) *Insane persons.* Insane persons who, in the opinion of the Court, are in an insane condition of mind at the time when they are offered as a witness, or who, in the opinion of the Court, were in that condition when the events happened of which they are called to testify.

(2) Children. Children or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated, or who do not understand the obligation of an oath.[4]

Every person is presumed to be sane and competent until the contrary is shown. *Hall v. Hall,* 352 S.W.2d 765 (Tex. Civ.App.–Houston 1962, no writ); *In re Price's Estate,* 369 S.W.2d 647 (Tex.Civ. App.–El Paso 1963), *rev'd on other grounds,* 375 S.W.2d 900 (Tex.1964); *Smith v. Lancaster,* 248 S.W. 472 (Tex.Civ. App.–Texarkana 1923, writ ref'd). The burden of proof rests on the party who claims that the witness is incompetent because of insanity to show the existence of insanity by preponderance of the evidence. *Saucier v. State,* 156 Tex.Crim. 301, 235 S.W.2d 903 (1950), *cert. denied,* 341 U.S. 949, 71 S.Ct. 1016, 95 L.Ed. 1372 (1951); 1 R. Ray, *Texas Law of Evidence Civil and Criminal* § 253 (Texas Practice 3d ed. 1980). Rule 601, as it existed at the time of trial, required that a party contending that a witness was incompetent must show (1) that the witness did not have the capacity to observe intelligently at the time of the events in question, (2) that the witness did not have the capacity to recall and narrate the events at the time of trial, or (3) that the witness did not have the capacity to understand the obligation of the oath.[5]

We have quoted the physician's letter extensively in footnote three because of the reliance placed upon it by the trial court in its decision to exclude Pete Long's deposition testimony. We look first to the evidence concerning the witness' capacity to observe intelligently at the time of the events in question. The doctor's report to the court included the following:

There are areas of his memory which are functioning properly and this would basically be related to areas of his mind which were functioning appropriately at the time of an event. Therefore, if he can recall appropriately known facts which occurred at a particular time, then his testimony about a particular incident which occurred at the same time should be considered as factual if it is corroborated by the other facts which are known to have occurred at the same general time.[6]

Steve Tilley, who was the representative on the well in question for Armco, testified by deposition that he was taking his instructions from Pete Long on setting the slips through the stack on that particular well. Jay Baron, president of Baron–Guernsey, testified that he had dealt with Pete Long when the pipe for that particular well was purchased. According to the testimony of Randy Martin, a service supervisor with the Western Company, Long appeared to be competent and in full charge of his mental faculties during the course of

4. This rule has been amended effective January 1, 1988, to delete the provision making children or other persons who do not understand the obligation of an oath incompetent to testify.

5. Some authorities divide witness competence requirements into four elements: (1) ability to perceive, (2) ability to remember what has been perceived, (3) ability to communicate to the trier of fact what was perceived and remembered, and (4) truthfulness. H. Wendorf and D.

Schlueter, *Texas Rules of Evidence Manual,* at 203 (2d ed. 1988).

6. According to the testimony, the events involved in this case occurred in 1983. According to Dr. McCrady's report, Pete Long related most of his problems to a motor vehicle accident that occurred around 1984. The doctor states that Long does not have any significant recall of this automobile accident.

the job. As with any witness, the factfinder must judge the final credibility, but the testimony of these witnesses corroborates that Pete Long was in a position to know the facts about which he testified. Therefore, the evidence does not show that Long was incapable of observing intelligently at the time the events in question occurred.

Next we examine the evidence concerning the witness' capacity to recall and narrate the events at the time of trial (or in this case, at the time of his deposition). The deposition reveals that Long had the capacity to recall and narrate events. The accuracy of his recall would have to be determined by the factfinder as with any other witness. The Long Trusts point to one question that occurred near the end of the deposition to show incapacity:

> Q Who was President of the United States in 1981? [7]
> A You know, I'm pretty tough on dates and things lately, but—
> Q That's all right.
> A I sure voted for him. I try to pick the right people and vote for them.

We do not find that this failure to recall would preclude Long from testifying about matters that he could recall. There is not sufficient evidence to show that Long was incompetent because of an inability to recall and narrate events.

We next look to the evidence concerning Long's incapacity to understand the obligation of the oath. There is no direct evidence on this point, but Dr. McCrady stated in his report to the Court: "He did seem to have the capacity to understand basic moral principles and the under-standing of right and wrong was intact." There is no evidence showing that Long did not understand the obligation of the oath.

The record does not support the court's exclusion of this witness on the basis of incompetency.

■ We next examine the proffered deposition testimony of Pete Long to determine whether Handel was harmed by its exclusion. Handel's sole defensive theory was that the pipe was mishandled in such a way that it caused the pipe to buckle. This theory was based on the presumption that the pipe was slacked-off about one half of its indicated weight.[8]

According to Handel's expert witness, Dr. Wooley, the compressive force going down the tubing string would balance with the wellhead supported tension at approximately 3,000 feet. He testified that this "neutral point" was the vulnerable point in the tubing string to a buckle caused by minimal lateral force and that this presumption places the "neutral point" at about the depth at which the collapse occurred in this case. The only testimony supporting this theory is the deposition of Pete Long, which was not admitted, into evidence. In his deposition, Long testified that he ordered about one half of the weight to be slacked off on this well.[9]

The Long Trusts' counsel repeatedly stated while cross-examining Wooley and later argued vehemently to the jury that Handel had offered *no* evidence upon which their defensive theory could be based. This excluded testimony would have provided that basis. Accordingly, we

---

7. The United States had two presidents during 1981.

8. Handel's expert testified that a one-half slack-off under these facts is approximately equal to two feet of slack-off or a reduction in pipe weight by 50,000 pounds at the wellhead.

9. Long testified as follows:
> Q On the Marwil Number 1, are you the one that determined how much to slack off on the casing?
> A Yes, sir, I handled that.
> Q All right. Do you recall what your instructions were about how much they should slack off?
> A You mean after we've cemented?

> Q Yes, sir.
> A Well, we'll—by the weight indicator we know how much tension it's under, and we'll relieve the tension on it—
> Q Do you know how much—
> A —after the casing and cement has set up.
> Q Do you know how much tension you told them to relieve?
> A We'd relieve about half of it. The weight of the pipe was pretty heavy, you know.
> Q Is that the instructions that you gave the people who were drilling the well?
> A The best of my recollection. I don't remember exact details there.

hold that the exclusion of this deposition testimony was not harmless error.

■ The Long Trusts contend in their last two reply points that this Court's holding cannot affect their judgment against Baron–Guernsey and its entitlement to eighty-five percent contribution against Handel. The applicable portion of the judgment reads as follows:

> It further appearing that the Jury verdict apportioned the liability in this case 15% to Baron–Guernsey Pipe Corporation and 85% to Mannesmann Handel, Baron–Guernsey Pipe Corporation is entitled to contribution and indemnity over against Mannesmann Handel for 85% of said amount and all subsequent interest at 85%.

■ As a general rule, when one party appeals from a judgment, a reversal as to that party will not justify reversal as to nonappealing parties. This rule, however, does not apply where the respective rights of the appealing and nonappealing parties are so interwoven or dependent on each other as to require a reversal of the entire judgment. *Turner, Collie & Braden v. Brookhollow, Inc.,* 642 S.W.2d 160 (Tex. 1982). Baron–Guernsey and Handel are distributors of the pipe in question, Baron–Guernsey having sold the pipe to the Long Trusts, and Handel having shipped the pipe to Baron–Guernsey. If the entire judgment is not reversed, Handel would still be liable to the Long Trusts indirectly for eighty-five percent of the remaining judgment. Because the rights of Handel are interwoven with Baron–Guernsey, the entire judgment is reversed and remanded for a new trial.